# United States Court of Appeals
## For the First Circuit

No. 99-1387
No. 99-1388

UNITED STATES OF AMERICA,

Appellee,

v.

SAMUEL PATRICK AND JASON ARTHUR,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Robert E. Keeton, U.S. District Judge]

Before

Boudin, Lynch, and Lipez, Circuit Judges.

Malcolm J. Barach for appellant Samuel Patrick.

Donald K. Freyleue, with whom Benjamin D. Entine was on brief, for appellant Jason Arthur.

Karin B. Hoppmann, Attorney, Criminal Division-Appellate Section, Department of Justice, with whom Donald K. Stern, United States Attorney, and George Vien, Assistant United States Attorney, were on brief, for appellee.

May 3, 2001

**LYNCH, Circuit Judge**.  This appeal raises questions about the definition of the "enterprise" element of criminal charges under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("RICO"), and the admissibility of evidence concerning the adequacy of police investigations and of investigation tips received by police officers as to who committed a crime.

Samuel Patrick and Jason Arthur were each convicted on over six counts of a criminal RICO indictment arising out of their membership in the Intervale Posse (IVP), a gang that distributed crack cocaine from 1990 to 1996 in the Dorchester neighborhood of Boston. Arthur was also convicted of the 1992 murder of a rival drug dealer. One of their defenses was that the IVP was simply a loose connection of individual, young drug entrepreneurs, one competing with another. RICO, they say, was meant to counter organized crime, and there was nothing particularly "organized" about the crimes committed by the IVP. They argue that their convictions should be reversed because the judge improperly instructed the jury, because the evidence did not support a RICO conviction, and for other reasons.

**I.**

Jason Arthur and Samuel Patrick were each charged in 1997 with racketeering under 18 U.S.C. § 1962(c), conspiracy to commit that offense under 18 U.S.C. § 1962(d), and conspiracy to distribute crack cocaine under 21 U.S.C. § 846.  Arthur was charged with two counts and

Patrick with three counts of possession of crack with intent to distribute under 21 U.S.C. § 841(a)(1).[1]  In addition, Arthur was charged with murder in aid of racketeering under 18 U.S.C. § 1959. Both were convicted and sentenced to life imprisonment.

## II.

We describe the evidence as the jury could reasonably have found it.  During the 1990s, members of the IVP sold crack cocaine in the Intervale neighborhood of Dorchester, an area of Boston.  The IVP was the successor to an earlier gang, known as "Adidas Park."  The gang gave a new spin to the concept of brand identification.  IVP members wore Adidas clothing, identified themselves and referred to the gang by signifying the Adidas brand logo (a sign of three fingers signifying the three stripes on Adidas products), and, in a few instances, owned mirrors painted with their nicknames and the IVP logo.  Members referred to one another as family.  Younger members, often teenagers,

---

[1]     Thirteen others were indicted along with Arthur and Patrick.  Twelve pled guilty to various charges prior to trial; one, Terrence Williams, successfully moved to sever his case from Arthur and Patrick's, and was convicted at trial of conspiracy to distribute crack cocaine.  The court originally consolidated Williams' appeal with this one, but then granted the government's motion to file a separate brief in Williams' case.

"pumped"[2] (or sold) drugs for the older members, although some younger members also operated on their own.

Patrick held the supplier's role within the IVP. He decided who could sell on IVP territory, set the prices for the IVP's crack, and directed sales by younger members. Patrick also determined when the gang would eliminate rivals. Arthur supplied crack to the IVP and also bought crack from Patrick. In addition, Arthur helped keep order in the IVP, reprimanding younger members for risky behavior that attracted police attention.

As part of the IVP's operating procedures, IVP members would page suppliers like Patrick and Arthur to deliver drugs to a customer's house. At the house, the crack was "cut" and "bagged" in smaller amounts for resale on the street, and the customer was paid in crack or money for use of the house. Although IVP members competed with one another for individual customers, they all profited from increased sales overall in the neighborhood. Only IVP members could sell on the IVP's "turf," and the gang used actual and threatened violence to deter rivals. Members held "sessions" (or meetings) where they discussed rival drug operations as well as problems with police.

In December 1992, Courtney Thomas, a non-IVP member, was selling drugs on IVP territory without permission. When an IVP member

---

[2]     "Pumping" described a way of serving the drug buyer, just as a gas station attendant pumps gas for his or her customer.

named Antwan told Thomas that he could not "pump" on IVP territory, Thomas threatened him.  Antwan informed Arthur, who said he would "handle it."  That evening Arthur met two other IVP members, Cecil McKnight and Allen Ivy, at a wooded area where the IVP hid drugs and weapons.  Arthur carried two guns.  The three men went to the house at 161 Intervale Street where Thomas was reportedly selling drugs.  When Thomas got into his car in front of the house, Arthur fired repeatedly into the car, killing Thomas and wounding Thomas's companion, Fleurette Farrell.

In 1995, Jennifer Monteiro, a neighborhood resident and reported drug dealer, was arrested on unrelated charges involving the use of fraudulent or stolen credit cards.  Monteiro agreed to cooperate with the police and began making purchases from the IVP, including several purchases in 1996 from Arthur and Patrick.  Audio tapes of these transactions were made.  One purchase occurred on July 24, 1996, when Monteiro paged Patrick for two ounces of crack.  Patrick directed her to go to a park near a neighborhood school, where Monteiro was met by a go-between named Terrence.  Terrence handed Monteiro the drugs and then gave the money to Patrick, who was in his parked truck nearby.  In August 1996, police arrested several IVP members, including Patrick and Arthur.  Police seized cash, drugs, scales, and items with the IVP or Adidas logo from the homes of IVP members.  From Jason Arthur's home, police seized over 300 grams of crack cocaine, several thousand

dollars, a scale, and a mirror with the IVP logo and the name "Kilo J."

They also seized a handgun from Patrick's truck.

**III.**

A. RICO Enterprise: Instructions and Sufficiency

       Both defendants claim that the district court erred in rejecting their proposed jury instruction which defined a criminal "enterprise" under 18 U.S.C. § 1962(c)[3] as having an "ascertainable structure," and that the jury's verdict cannot stand on the evidence. The district court did not err, and the evidence supports the verdict.

       The district court charged the jury that under RICO the term "enterprise":

> includes any individual, partnership, corporation, association or other legal entity, and any group of individuals associated in fact although not a legal entity. An enterprise may be a formal or an informal organization of individuals so long as they have associated together for a common purpose. . . . In the present case, it is alleged that each defendant, and others, were associated in fact to form an

---

[3]    Section 1962(c) makes it unlawful:

> for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Section 1962(d) prohibits conspiracy to violate section 1962(c).

enterprise, called among other names, Intervale, the Intervale Posse, and IVP. To find that an association in fact existed, you must find that the alleged enterprise had an ongoing organization, formal or informal, and that its various associates functioned as a continuing unit for a common purpose. This means that although individuals may come and go, the enterprise must continue in an essentially unchanged form during substantially the entire period alleged in the indictment.

Note that the enterprise element is different from the racketeering activity element. Although the proof to establish these elements may overlap, proof of one does not necessarily establish the other. Rather, the enterprise must be an entity separate and apart from the pattern of racketeering activity in which it engages.

The defendants requested that the district court further define the term "enterprise" by instructing the jury that "[a]t a minimum, the enterprise must exhibit some sort of structure for the making of decisions, whether it be hierarchical or consensual." The court refused, and defendants now appeal its "enterprise" instruction.

Defendants based their request on a line of cases which they say support the requirement of an explicit "ascertainable structure" jury instruction under RICO. See Chang v. Chen, 80 F.3d 1293, 1297 (9th Cir. 1996); United States v. Riccobene, 709 F.2d 214, 222 (3d Cir. 1983), overruled on other grounds by Griffin v. United States, 502 U.S. 46 (1991); United States v. Bledsoe, 674 F.2d 647, 664 (8th Cir. 1982). Defendants refer to their proposed language as the Bledsoe test. In Bledsoe, which involved securities fraud, the Eighth Circuit required

"proof of some structure separate from the racketeering activity and distinct from the organization which is a necessary incident to the racketeering" in order to avoid to collapse of the "enterprise" element with the separate "pattern of racketeering activity" element of a RICO offense. 674 F.2d at 664. Bledsoe thus required that a RICO enterprise have an "ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering activity. . . . [which] might be demonstrated by proof that a group engaged in a diverse pattern of crimes or that it has an organizational pattern or system of authority beyond what was necessary to perpetrate the predicate crimes." Id. at 665 (internal quotation marks and citation omitted); see also Chang, 80 F.3d at 1297 (adopting "ascertainable structure" requirement to avert the danger of the "enterprise [being] no more than the sum of the predicate racketeering acts"). The prosecution rejoins that Bledsoe and its successors like Chang use the concept of "ascertainable structure" simply as an analytic device in determining whether the evidence was sufficient to support the verdict, and also argues, in a bit of non-sequitur, that the phrase has no use as a jury instruction. Cf. Riccobene, 709 F.2d at 223 (evidence sufficient to satisfy "enterprise" prong where, inter alia, it showed "an organization with a leader and a group of supervisors, each running his own operations with 'his own people,' but coordinated with the

-8-

operations of other supervisors to provide greater profits and fewer conflicts").

Here, the district court took its instruction almost directly from the language of the Supreme Court's decision in United States v. Turkette, 452 U.S. 576 (1981), and no more was needed to define the term "enterprise" for the jury. This court was before asked to adopt the Bledsoe test; it did not need to resolve the question because the evidence was sufficient even assuming arguendo the Bledsoe test applied. See United States v. London, 66 F.3d 1227, 1244 (1st Cir. 1995); see also United States v. Owen, 167 F.3d 739, 752 n.6 (1st Cir. 1999) (noting that First Circuit has not adopted Bledsoe test; concluding that evidence sufficiently established "enterprise" separate from "pattern of racketeering activity"). We today explicitly reject the Bledsoe test as an additional requirement beyond the Turkette instruction. Indeed, we think the defendants' proposed Bledsoe instruction could be misleading. The important concept underlying Bledsoe was that the government must prove both an "enterprise" and a "pattern of racketeering activity." See Bledsoe, 674 F.2d at 663-65. That concept was specifically captured in the instruction given by the district court in this case. Bledsoe should not be torn from its conceptual moorings. So too were instructions given here on the important concepts that an enterprise is proved, as Turkette had said, by evidence of an "ongoing organization" that was

"formal or informal" and by evidence that "the various associates function as a continuing unit." Turkette, 452 U.S. at 583; see also Riccobene, 709 F.2d at 221 (saying Turkette defined "illegal enterprise" for RICO purposes to avoid the danger that the statute would be construed too broadly). While "enterprise" and "pattern of racketeering activity" are separate elements of a RICO offense, proof of the these two elements need not be separate or distinct but may in fact "coalesce." Turkette, 452 U.S. at 583. The defendants' proposed jury instruction here addressed not the ongoing nature of the enterprise -- a problem addressed in Turkette -- but rather its structure. Here, on the issue of structure and its ascertainability, the slope is slippery, and the district court appropriately avoided the slope's edge. Since Congress intended the term "enterprise" to include both legal and criminal enterprises, see id. at 580-81, and because the latter may not observe the niceties of legitimate organizational structures, we refuse to import an "ascertainable structure" requirement into jury instructions.

Defendants also argue that there was insufficient evidence of any enterprise. Not so. The gang was ongoing and identifiable: it changed its name from Adidas to the IVP, it had colors and signs, it had older members who instructed younger ones, its members referred to the gang as family, and it had "sessions" where important decisions

-10-

were made, including decisions about taking action against rival drug dealers.

Defendants protest that the IVP is just a motley crew of young criminals and that it hardly constitutes the type of highly sophisticated organized crime that spurred Congress to enact RICO. Even if the IVP were a fledgling criminal organization, we doubt that Congress meant to give a pass to such fledgling organizations. In any event, the IVP was no innocent group of teenagers, but rather was sophisticated and experienced in its own way in the rough, often violent business of drug dealing. That there was yet no evidence the IVP had infiltrated legitimate businesses as organized crime frequently has done does not insulate the IVP from RICO's reach. The IVP was well within Congress' intended scope. See Turkette, 452 U.S. at 591 ("RICO is equally applicable to a criminal enterprise that has no legitimate dimension or has yet to acquire one. Accepting that the primary purpose of RICO is to cope with the infiltration of legitimate businesses, applying the statute . . . so as to reach criminal enterprises, would seek to deal with the problem at its very source.").

B.  Sufficiency of the Evidence of Conspiracy

Arthur argues that there was no evidence of any meetings among the alleged conspirators resulting in Arthur's agreement to perform the predicate acts under RICO. Arthur says the fact that he actually committed two or more acts of racketeering activity is not

enough to show he was a conspirator. For these purposes, we focus on the predicate acts of murder and drug dealing.

The government, citing United States v. Shifman, 124 F.3d 31 (1st Cir. 1997), says that a RICO conspiracy may be shown by evidence that the defendant agrees to commit two or more predicate acts "or in fact commit[s]" such acts. Id. at 35.[4] We rely on an alternate ground: the well-established legal principle that a conspiracy may be based on a tacit agreement shown from an implicit working relationship -- here the relationship between Arthur and other IVP members -- to commit the Thomas murder. The evidence supports the jury's conclusion that there was at least a tacit agreement. There was evidence that the IVP routinely eliminated the competition by murdering rival drug dealers. When Arthur was given a report by an IVP member about Thomas selling drugs on IVP turf, Arthur replied that he would "handle it." Arthur handled it by murdering Thomas, with the assistance of two other IVP members.

---

[4]    Shifman says that the government must prove: (1) the existence of an enterprise affecting interstate commerce, (2) that the defendant knowingly joined the conspiracy to participate in the conduct of the affairs of the enterprise, (3) that the defendant participated in the conduct of the affairs of the enterprise, and (4) that the defendant did so through a pattern of racketeering activity by agreeing to commit, or in fact committing, two or more predicate offenses. Id. (emphasis added).

As to the drug dealing, there was evidence that the IVP had "sessions" where members discussed the gang's drug distribution business. That was enough to permit the inference of an agreement.

Patrick raises the same argument in a summary fashion in his brief, and we reject it for the same reasons.

## C.   Evidentiary Rulings

Questions of admissibility and relevance of evidence are reviewed for abuse of discretion. United States v. Reeder, 170 F.3d 93, 107 (1st Cir.), cert. denied, 528 U.S. 872 (1999).

## 1.   Audio Tape Recordings

Patrick argues that it was error to admit into evidence audio tape recordings made by government informant Monteiro of her drug transactions with IVP members, including Patrick. Patrick says the tapes did not accurately reflect what was said and that he should have been permitted to inspect the original recordings and to cross examine as to the equipment used. The net result of the exclusion of this evidence, he says, violated the Confrontation Clause of the Sixth Amendment and Rule 403, Fed. R. Evid.

Patrick, however, did cross examine Monteiro about the tapes and the equipment used, and his objections to the tapes at trial were more limited than those on appeal. At trial he objected on the grounds that one tape had only a one-sided conversation and that another tape had a conversation in which Patrick did not take part.

In any event, we ignore the issue of waiver because there was no error in admitting the tapes. Monteiro authenticated the tapes under Rule 901, Fed. R. Evid., and the tapes were relevant, corroborating Monteiro's testimony. Further, Patrick was given funds to pay for an analysis of at least one tape, a tape on which Patrick quoted Monteiro the price for an ounce of crack. The court rejected the conclusion of Patrick's "expert" that something had been added to the tapes, finding the expert unqualified and his conclusion unsupported. The trial judge's determination that the original tape would be best preserved for trial use by not turning it over to Patrick was very reasonable.[5]

## 2. Exclusion of Handwritten Notes of Informant Tips

Arthur complains that the district court excluded from evidence certain handwritten notes found in police files, including one purporting to contain a statement from a Peter Eden. In common, the notes recorded tips the police had received about who committed the Thomas murder. The defense theory was that the police had not adequately investigated the murder, as evidenced by these notes. Arthur argues that the notes therefore were not hearsay because they were not offered for their truth but rather for the inadequacy of the police investigation of other possible suspects.

---

[5] Finally, to the extent Patrick complains that a second motion for more money for analysis of the tapes was denied, the court did not abuse its discretion in denying that motion.

The precise question is whether the trial court abused its discretion in excluding police notes (and related testimony) of anonymous calls from tipsters about who committed the Thomas murder. This involves several doctrines, starting with relevance. In fact, Arthur has two theories, each of which he says created doubt as to his own guilt: (1) that the notes were evidence that someone else committed the murder;[6] and (2) that the notes were evidence that the police investigation was unreliable.[7] As to the first, evidence that tends to prove that a person other than the defendant committed the crime is relevant. See United States v. Crosby, 75 F.3d 1343, 1347 (9th Cir. 1996). It must, however, be evidence that there is a connection between the other perpetrator and the crime, and not mere speculation. Cf. United States v. Camuti, 78 F.3d 738, 742 (1st Cir. 1996)

---

[6] That is the thrust of State v. Flores, 595 N.W.2d 860 (Minn. 1999), a case relied on by Arthur. Flores says a defendant may seek to introduce evidence of prior bad acts by a third person tending to show that third person committed the crime. Id. at 868. Flores also held that such evidence must have a proper foundation, such as proof of facts that connect the third person to the crime, "to avoid the consideration of matters collateral to the crime." Id. (internal quotation marks omitted).

[7] These two theories overlap in places. When, for example, Arthur asserts that the tipsters said "flatly" that another person murdered Thomas, he seems less to be defining the notes as non-hearsay showing the inadequacy of the police investigation than claiming the notes should have been admitted for their truth, i.e., that such third person, and not Arthur, murdered Thomas.

-15-

(concluding that inferences that investors were responsible for alleged real estate fraud were "so thin that they can barely, if at all, meet the generous test of relevance under Fed. R. Evid. 401").  When the evidence is that person X, a non-party, said outside the courtroom that person Y committed the crime, that evidence is offered for the truth of the statement and is hearsay.  The defendant can call person X as a witness and have him testify.[8]  That is not, however, the nature of the evidence that concerns us.  What Arthur sought to introduce were police notes that person X (often not identified at all) told the police that person Y (often identified only by a single name) had committed the Thomas murder.  In order to offer the police notes for the truth of their contents: (a) the notes must be admissible themselves under some exception to the hearsay rule or be sufficiently trustworthy as to fall within the residual exception of Fed. R. Evid. 807; (b) the hearsay within the notes must be admissible; and (c) the evidence must not be so prejudicial as to violate Fed. R. Evid. 403.  See generally 40A Am. Jur. 2d Homicide § 286 (1999) ("In a prosecution for homicide, as in prosecutions for other crimes, the accused may introduce any legal evidence tending to prove that another person may have committed the crime with which the defendant is charged, provided such evidence is

_____

[8]     We recognize that anonymous tipsters are hardly likely to make themselves available to defense counsel.

-16-

<u>not otherwise subject to objection</u>.") (internal footnotes omitted) (emphasis added).

Arthur argues that police notes may be admissible as business records under Fed. R. Evid. 803(6), and we shall assume so for purposes of argument.  But where those notes contain information from informants who are not themselves part of the business of police, that information is not admissible as an exception to the hearsay rule.  The district court properly ruled that such hearsay within hearsay is not itself admissible.  <u>See</u> Fed. R. Evid. 803 advisory committee's note to para. 6 (<u>citing</u> <u>Johnson</u> v. <u>Lutz</u>, 253 N.Y. 124 (1930), <u>and</u> <u>Gencarella</u> v. <u>Fyfe</u>, 171 F.2d 419 (1st Cir. 1948)); <u>see also</u> <u>United States</u> v. <u>Vigneau</u>, 187 F.3d 70, 75-76 (1st Cir. 1999) (further discussing the issue).  Nor do police notes contain findings of a public agency charged with making those findings, which would render the notes admissible under Fed. R. Evid. 803(8).  <u>E.g.</u>, <u>Beech Aircraft Corp.</u> v. <u>Rainey</u>, 488 U.S. 153 (1988).  Thus, the informant tips are not admissible for their truth under the standard exceptions to the hearsay rule and are not otherwise sufficiently trustworthy to qualify for admission under the residual exception provided in Rule 807.

Arthur tries to avoid this problem by turning to his second theory: that the tips are admissible not for their truth but to show the inadequacy of the police investigation.  He relies primarily on a state case that does use such broad language, <u>Commonwealth</u> v. <u>Reynolds</u>,

708 N.E.2d 658, 661 (Mass. 1999), but which most likely stands for a narrower proposition.[9] The phrase "inadequacy of the police investigation" covers a variety of different problems and cuts across the full spectrum of relevant and irrelevant evidence. Certain inadequacies -- for example, those that go to the chain of custody or the preservation of evidence -- may undercut the reliability of physical evidence against the accused. See, e.g., Lowenfield v. Phelps, 817 F.2d 285, 291-92 (5th Cir. 1987) (reasonable trial strategy for counsel to argue that "sloppy police work" tainted the chain of custody for certain guns seized by police and "set the stage for an argument that others were implicated in the murders"). That is not the problem here. Other inadequacies may lead to the destruction of exculpatory evidence. That is also not the problem here. The point is that the phrase "inadequacy of the police investigation" is too broad and itself says nothing about the relevance of the proffered evidence. Merely showing that an investigation is sloppy does not establish relevance. See United States v. Veal, 23 F.3d 985, 989 (6th Cir. 1994) (no abuse of discretion where district court excluded as irrelevant evidence that the government's investigation of the case was "sloppy").

Here, the defense theory is that someone else committed the murder, that this is shown by the fact that other names were given to

_____

[9] Reynolds is in any event a case not decided under the federal rules of evidence.

-18-

the police by the tipsters, and that the police failed to take steps to adequately eliminate other possible suspects before settling on Arthur, thereby creating doubt as to Arthur's guilt.  However, there was little to show that the notes of the tipsters' calls in fact furthered Arthur's theory, or that there was an inadequate investigation,[10] and so the note contents were of questionable materiality under Fed. R. Evid. 401.  But even if the notes had some probative value, the district court did not abuse its discretion in excluding them under Fed. R. Evid. 403.

Such speculative evidence of the inadequacy of the police investigation would have shifted the jury's focus from the accusations against Arthur to accusations against the police, thus creating a real danger of unfair prejudice and jury confusion that "substantially outweighed" the evidence's probative value.  Fed. R. Evid. 403; see United States v. McVeigh, 153 F.3d 1166, 1190-92 (10th Cir. 1998), cert. denied, 526 U.S. 1007 (1999).  Arthur wrongly relies on Crosby, supra, which was concerned with the exclusion of evidence that a victim's husband was more likely her assailant than was the defendant. See 75 F.3d at 1346-48.  The Crosby court's determination that it was error to exclude evidence of sloppy police work was tied to its more

_____

[10]    Detective Mahoney, the officer in charge of the Thomas investigation, testified on voir dire that his usual practice was to follow up on informant tips, though he could not recall, six years and "400 homicides" later, what action he took on each and every tip.  This does not suggest an inadequate investigation of the Thomas murder.

-19-

fundamental assessment that it was error to exclude the strong direct evidence that someone else (the victim's husband) had committed the crime, which was the defendant's theory of the case. See id. at 1348 ("The excluded evidence [of sloppy police investigation] would have lent support to the defendant's theory that someone else beat [the victim] and undermined the prosecutor's claim that a more thorough investigation would have turned up nothing of value. Rather than being limited to poking holes in the prosecution's case, defendant's counsel could have plausibly argued that a more thorough investigation would have produced evidence incriminating [the victim's husband]."). Crosby thus does not stand for the proposition that evidence of sloppy police investigations is per se admissible.

Arthur also argues that a note based on the statement from Peter Eden, a drug dealer, should have been admitted under the hearsay exception for declarations against penal interest. See Fed. R. Evid. 804(b)(3). The note of Peter Eden's statement around the time of his arrest says that his (Eden's) boss ordered the murder of Thomas, which Arthur argues inculpates Eden himself in both a drug conspiracy and the murder.[11] At trial, Eden invoked his Fifth Amendment privilege against

---

[11] The note attributes the statement to a Paul Eden, not Peter Eden, but is apparently a record of Peter Eden's arrest. Arthur's contention is sheer speculation that this shows that the "Paul" referred to in the note was Peter Eden's boss, and therefore that this Paul, and not Arthur, murdered Thomas. The record also shows there was an IVP member named Paul.

self-incrimination and refused to testify. Arthur then sought admission of the note under Fed. R. Evid. 804(b)(3). Arthur argued that the Eden statement was exculpatory as to Arthur because it tended to implicate Eden's boss (whom, he says, was certainly not Arthur), and that the information was corroborated by the fact that the police files were "fairly bursting with notes and memoranda" detailing tips identifying someone named "Paul, "Paulo" or "Pablo" as Thomas's killer.

The district court refused to admit the note because it doubted that the note exculpated Arthur, thought Arthur might himself be the "boss" referred to, and found no corroborating circumstantial evidence indicating the trustworthiness of the statement.

There was no abuse of discretion in excluding the note. Rule 804(b)(3) provides that a statement "tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." Id. (emphasis added). It was up to Arthur, as the proponent, to clearly indicate the admissibility of the statement, and he did not establish that it was either trustworthy or exculpatory. The district court correctly viewed the statement in context. Williamson v. United States, 512 U.S. 594, 603 (1994). The author of the Eden note was never identified; the arresting officer denied it was his note, said he did not know who wrote the note, and

-21-

did not recall speaking with Eden about a homicide.  The note apparently misidentifies Peter Eden as Paul Eden and refers to an unnamed boss.  There is no firm evidence as to whether the universe of plausible bosses includes or excludes Arthur.[12]  That there were anonymous tips from others identifying the murderer as a Latino man named Paul, Paulo, or Pablo suggests that Jason Arthur was not the murderer, but it is not an abuse of discretion to conclude that those tips do not particularly corroborate the trustworthiness of this note.

Arthur argues, alternatively, that the various tip notes are admissible because his Sixth Amendment right to present exculpatory evidence here trumps the rules against hearsay evidence.  Arthur cites, inter alia, Chambers v. Mississippi, 410 U.S. 284 (1973), which declared unconstitutional the mechanistic exclusion under Mississippi law of a third person's multiple confessions to the crime for which the defendant was tried.  See id. at 299-301; see also Pettijohn v. Hall, 599 F.2d 476, 480-81 (1st Cir. 1979) (violation of defendant's Sixth Amendment rights to exclude testimony of eyewitness who had identified another person as the guilty party).  Here, the tip information lacked the indicia of reliability of the testimony in Chambers, and, in

_____

[12]    Arthur says that Peter Eden operated out of 161 Intervale Street, an area not within IVP territory.  The district court thought the evidence was otherwise.

contrast to Chambers, was outside the basic rationale of the exception for declarations against penal interest. There was no error.

3. Exclusion of Portions of Search Warrant Affidavit

The district court excluded two portions of an affidavit in support of the search warrant for Fleurette Farrell's belongings. Arthur concedes that the statements in the affidavit are hearsay but says they are nonetheless trustworthy and should have been admitted because the statements about the timing of certain events would have been useful to impeach the government's principal witnesses against him. First, Arthur claims that the statement in the affidavit that police were still executing a search warrant at 161 Intervale Street when investigators arrived on the scene of the Thomas homicide contradicts the testimony of McKnight and Ivy, the key government witnesses, that the police had left the building before the shooting. Second, he argues that other statements in the affidavit contradict Farrell's testimony concerning the time she arrived at 161 Intervale Street and whether she actually entered the building.

The district court acted within its discretion.[13] Both statements contain multiple levels of hearsay, and Arthur points to no specific rule supporting admission of the testimony. Nor does the

_____

[13] Arthur also claims that the district court erred in allowing the government to cite Farrell's testimony in closing argument, where, based on the affidavit, it had reason to know her testimony contained false and misleading statements. There was no error.

-23-

residual exception provided in Fed. R. Evid. 807 help Arthur since he did not raise the argument. The exception was, in any event, unavailable since Arthur could have called as a witness any officer who actually conducted the search of 161 Intervale Street, rather than simply relying on the hearsay statements. See Fed. R. Evid. 807 (requiring proof that "the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts").

## 4. Altering a Chalk on Rebuttal Summation

Arthur argues the district court erred in allowing the prosecutor to "alter" a chronology used as a chalk (or jury aid) on rebuttal summation to support the government's position as to the time of Thomas's death. Although prosecution witness Farrell testified that the shooting occurred around 10:15 p.m., the defense theory was that it occurred earlier, between 8:30 and 9:00 p.m. On summation, the prosecutor used a timeline to assist the jury in understanding the sequence of events surrounding the Thomas murder. The chalk, which was never entered into evidence, initially listed the following times: undercover purchase (8:45 p.m.); search warrant (9:00 p.m.); and time of homicide (10:17 p.m.). On rebuttal summation, the prosecutor added to the chalk that Thomas was pronounced dead at 10:46 p.m., a fact already in evidence. This was entirely proper. Cf. United States v. Morse, 491 F.2d 149, 153 n.6 (1st Cir. 1978) ("use [of chalks] must be

-24-

fully supported in all respects by corroborating admissible evidence").
Not only was there no prejudice, but the prosecutor actually reinforced
Arthur's position that 10:46 p.m. represented not the time Thomas died
but rather the time he was pronounced dead.

D. Brady Claim

Patrick argues vaguely that the prosecution withheld
exculpatory information in violation of Brady v. Maryland, 373 U.S. 83
(1963).  Under Brady, the government must provide the defense with
evidence in its possession "where the evidence is material either to
guilt or to punishment."   Id. at 87.  Evidence relating to the
impeachment of prosecution witnesses is deemed to be exculpatory within
the meaning of the Brady rule.  See Giglio v. United States, 405 U.S.
150, 154-55 (1972).  For evidence to be "material" under Brady, there
must be "a reasonable probability that, had the evidence been disclosed
to the defense, the result of the proceeding would have been
different."  United States v. Bagley, 473 U.S. 667, 682 (1985); see
United States v. Perkins, 926 F.2d 1271, 1275 (1st Cir. 1991).  "Where
. . . the defense is confronted not with complete suppression, but with
delayed disclosure, reversal will be granted only if defendants were
denied the opportunity to use the disclosed material effectively."
United States v. Drougas, 748 F.2d 8, 23 (1st Cir. 1984).

Patrick's brief fails to describe fully the nature of the
problem or why he was prejudiced by learning the information at trial

and not earlier.  The government's brief helpfully explains the issue.

Two police officers who were conducting surveillance at the time,

government informant Jennifer Monteiro, and IVP member Allen Ivy all

testified about the same July 24, 1996 sale of drugs.  They had

different recollections about whether it was Patrick or another IVP

member who was in the area on a bicycle around the time of the

transaction.  However, there is no evidence the government knew of the

discrepancy before trial, and defense counsel cross examined on the

different versions.  During trial the names of the two police officers

were given to defense counsel.  Both officers were called and

testified.[14]  There was neither a <u>Brady</u> violation nor prejudice.

E.   Post-Trial Motion for Investigative Funds

Arthur claims the district court abused its discretion in

denying his motion for additional funds under 18 U.S.C. § 3006A to

conduct a post-trial investigation.  Arthur's counsel told the trial

court he needed the funds to find additional witnesses who would cast

doubt on Farrell's testimony.  Although he knew the name of one witness

who was at 161 Intervale Street on the night of the Thomas murder,

counsel conceded he was "speculating on precisely what [these

witnesses] would say."  The district court found no evidence to support

the conclusion that exculpatory evidence was withheld and denied the

---

[14]    Neither officer was able to identify the male who "burned"
their surveillance operation by looking into their vehicle.

-26-

motion on that basis alone.[15]  A denial of a motion for funds under

section 3006A is reviewed for abuse of discretion.  See United States

v. De Jesus, 211 F.3d 153, 155-56 (1st Cir. 2000).  We have carefully

reviewed the record, and find that the district court did not abuse its

discretion in denying the motion.

F.   Sentencing

Defendants also challenge their sentences on various grounds.

Patrick asserts that the district court wrongly sentenced him

based on its finding that he was involved with more than 1.5 kilograms

of crack cocaine because the court denied his motion under 18 U.S.C. §

3006A for an independent examination of some of the crack cocaine to

determine its weight.  Patrick also challenges his four-level

enhancement for his role as a "leader or supervisor" under U.S.S.G. §

3B1.1 and the district court's refusal to depart downward based on his

family ties and responsibilities.

Arthur argues that the district court erred in imposing a

three-level enhancement for his role as a "manager or supervisor" under

U.S.S.G. § 3B1.1 and a two-level enhancement for employing juveniles in

the drug operations under U.S.S.G. § 3B1.4.

Patrick and Arthur also each make claims based on Apprendi

v. New Jersey, 120 S. Ct. 2348 (2000).

---

[15]    The court denied Arthur's new trial motion on the same
basis.

We discuss these arguments in turn and affirm the sentences.

## 1. Denial of Motion for Funds to Conduct Independent Weighing

In connection with his sentence, Patrick appeals the district court's denial of his motion for funds to conduct an independent weighing and examination of the amount of crack cocaine attributed to him. We review his claim for abuse of discretion, see De Jesus, 211 F.3d at 155, and find none. Patrick correctly points out that due process considerations animate motions for investigative funds under section 3006A. Still, "concern for fairness does not mean that all applications should be granted regardless of merit." United States v. Mateos-Sanchez, 864 F.2d 232, 240 (1st Cir. 1998). Here, Patrick was able to extensively cross examine the government chemist, who testified as to the weight of the crack cocaine from the various transactions, and Patrick presented the court with no reason why the chemist's determinations might be questionable. Moreover, the issue Patrick argues would not affect his sentence since his conspiracy conviction renders him responsible for all reasonably foreseeable amounts of drugs distributed in furtherance of the conspiracy. See U.S.S.G. § 1B1.3(a)(1)(B) (Relevant Conduct); United States v. Collazo-Aponte, 216 F.3d 163, 200 (1st Cir. 2000) ("In the context of a drug conspiracy, a defendant is also accountable for the conduct of others if that conduct is (1) reasonably foreseeable to the defendant and (2) committed in furtherance of a jointly undertaken criminal activity."). The district

-28-

court found this amount to be well over 1.5 kilograms, and there is no real claim that this finding was wrong.

## 2. Sentencing Enhancements

Review of challenges to the evidentiary support of a sentencing guidelines enhancement is for clear error.  See, e.g., United States v. Coviello, 225 F.3d 54, 64-65 (1st Cir. 2000).  Patrick challenges the four-level enhancement for his role as an "organizer or leader" of an extensive criminal activity under U.S.S.G. § 3B1.1(a). The district court found that Patrick occupied "the primary role" in the IVP and was considered "the undisputed leader" by older and younger members alike.  The record clearly supports this finding.  Patrick had ultimate decisionmaking authority in the IVP (Arthur, for one, referred to Patrick as "chief" and "top dog").  He determined who could sell on IVP territory, decided when to take action against rival drug dealers, recruited juvenile accomplices, and supplied the IVP with a large quantity of drugs.  See U.S.S.G. § 3B1.1 comment (n. 4) (listing factors distinguishing "a leadership and organizational role from one of mere management or supervision").

Arthur objects to the three-level enhancement for his role as a "manager or supervisor" under U.S.S.G. § 3B1.1(b).  The district court found that while Arthur was lower in the IVP hierarchy than Patrick, he supervised and managed drug transactions since he determined the quantity involved in each particular transaction.

Arthur also objects to the two-level enhancement under section 3B1.4 for "using a minor to commit a crime." The district court found that numerous minors were used in the RICO and drug conspiracies and that Arthur himself used minors to sell drugs. Neither finding was clearly erroneous.

The three-level enhancement for Arthur's managerial or supervisory role was supported by evidence that he owned and distributed large quantities of crack (over 300 grams were found in his house), gave orders to younger IVP members, and used violence to eliminate rivals like Thomas. See United States v. Alicea, 205 F.3d 480, 485 (1st Cir.) ("[T]he inference that the [defendant] was [the gang's] leader flows rationally from the evidence that he owned the drugs, that he gave orders freely, and that he was prepared to use extreme measures if anything went awry."), cert. denied, 121 S. Ct. 256 (2000). With respect to the two-level enhancement for employing juveniles, Arthur relies on evidence that juveniles worked for Patrick or another IVP member, and that no witness testified that Arthur himself employed juveniles. However, because Arthur was convicted of conspiracy, his sentence could be enhanced based on his co-conspirators' reasonably foreseeable use of juveniles to further the IVP's activities. See U.S.S.G. § 1B1.3(a) ("adjustments in Chapter Three" must be determined in a conspiracy based on "all reasonably foreseeable acts and omissions of others in furtherance of the jointly

undertaken criminal activity"); see also United States v. Li, 206 F.3d 78, 86-87 (1st Cir.), cert. denied, 121 S. Ct. 379 (2000).

### 3. Downward Departure

A district court's discretionary refusal to depart downward is unreviewable unless the court believed it lacked authority to do so. See, e.g., United States v. Snyder, 235 F.3d 42, 51 (1st Cir. 2000); United States v. Lauzon, 938 F.2d 326, 330 (1st Cir. 1991). Here, the district court, exercising its discretion, found it inappropriate to depart because Patrick had not identified any factors that took his case outside the "heartland." See Koon v. United States, 518 U.S. 81, 95 (1996). Finding no indication that the district court believed it lacked authority to depart downward, we affirm.

### 4. *Apprendi* Claims

Neither defendant raised any Apprendi argument before the district court, and so we review their Apprendi arguments here for plain error. See United States v. Robinson, 241 F.3d 115, 119 (1st Cir. 2001); United States v. Mojica-Baez, 229 F.3d 292, 306-07 (1st Cir. 2000). In Apprendi, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 120 S. Ct. at 2362-63. We reject Patrick's Apprendi argument because Patrick was previously convicted of a drug felony, and because the record establishes that no

jury would have failed to find beyond a reasonable doubt that his (various) drug crimes here involved over 5.0 grams of cocaine base, thus triggering a maximum sentence of life imprisonment.  See 21 U.S.C. § 841(b)(1)(B)(iii); 18 U.S.C. § 1963.  Patrick relies on United States v. Fields, 242 F.3d 393 (D.C. Cir. 2001), which found plain error under Apprendi where there was arguably insufficient evidence of drug quantity to meet the proof beyond a reasonable doubt standard.  Id. at 397.  There was no such insufficiency here.

Arthur cites Apprendi as bearing upon his attack on his sentencing guideline enhancements.  We reject that challenge. See, e.g., Robinson, 241 F.3d at 121-22.  As to Arthur's drug crimes, the record establishes that no jury could have failed to find beyond a reasonable doubt that all of those crimes involved more than five grams of crack cocaine.  The drug crimes, coupled with Arthur's two prior felony drug convictions, subjected him to a maximum sentence of life imprisonment.  See 21 U.S.C. § 841(b)(1)(B)(iii).  In addition, the jury found beyond a reasonable doubt that Arthur committed murder, which carries a mandatory sentence of life imprisonment under Massachusetts law, see Mass. Gen. Laws ch. 265, § 2, as one of his predicate acts of racketeering.  Thus, Arthur's maximum sentence for

-32-

racketeering and racketeering conspiracy was life imprisonment.
See 18 U.S.C. § 1963.

## IV.

Defendants' convictions and sentences are affirmed.

So ordered.