# United States Court of Appeals
## For the First Circuit

No. 22-1157

UNITED STATES OF AMERICA,

Appellee,

v.

HENRI SALVADOR-GUTIERREZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

Before

Barron, Chief Judge,
Howard, Kayatta, Gelpí, Montecalvo, Rikelman, Circuit Judges.

Stephen Super, with whom George F. Gormley and George F. Gormley, P.C., were on brief, for appellant.

Mark T. Quinlivan, Assistant U.S. Attorney, with whom Joshua S. Levy, Acting U.S. Attorney, was on brief, for appellee.

February 13, 2025

Opinion En Banc

**BARRON, <u>Chief Judge</u>**.  Section 3B1.4 of the United States Sentencing Guidelines ("Guidelines")[1] provides that "[i]f the defendant used or attempted to use a person less than eighteen years of age to commit the offense or assist in avoiding detection of, or apprehension for, the offense, increase by 2 levels" the defendant's offense level.  U.S.S.G. § 3B1.4.  A panel of this Court held in <u>United States</u> v. <u>Patrick</u>, 248 F.3d 11 (1st Cir. 2001), that the application of § 3B1.4's two-level upward adjustment is not limited to when the defendant, by an affirmative act, personally used or attempted to use a minor to commit the offense or assist in avoiding detection of, or apprehension for, the offense.  The panel held that, in the case of a conspiracy offense, the adjustment also applies when it was merely reasonably foreseeable that other members of the conspiracy would use a minor within the scope of, and in furtherance of, that conspiracy.  <u>Id.</u> at 27-28.

The panel relied for this ruling on the guideline that defines the "[r]elevant [c]onduct" for which a defendant, as a general matter, is accountable in sentencing.  <u>See</u> U.S.S.G. § 1B1.3; <u>Patrick</u>, 248 F.3d at 28.  This guideline provides in

---

[1] All references are to the 2021 edition of the Guidelines, which was the edition in effect when appellant was sentenced.  <u>See</u> <u>United States</u> v. <u>Douglas</u>, 644 F.3d 39, 41 (1st Cir. 2011) (citing U.S.S.G. § 1B1.11(a)).  No amendments have been made to § 3B1.4 since.

pertinent part that "[u]nless otherwise specified" adjustments -- such as the adjustment set forth in § 3B1.4 -- "shall be determined on the basis of the following":

> (1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
> (B) in the case of a jointly undertaken criminal activity . . . all acts and omissions of others that were --
> > (i) within the scope of the jointly undertaken criminal activity,
> > (ii) in furtherance of that criminal activity, and
> > (iii) reasonably foreseeable in connection with that criminal activity;
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

U.S.S.G. § 1B1.3(a).

Sitting en banc, we agree with the appellant in this case, Henri Salvador Gutierrez,[2] that Patrick must be overruled, after considering that precedent anew in the wake of developments in the Guidelines and the case law since that ruling. Thus, we hold that, contrary to Patrick, even in the case of a conspiracy or other offense that involves jointly undertaken criminal activity, § 3B1.4's upward adjustment applies only when the defendant, by an affirmative act, personally used or attempted to

---

[2] We refer to the appellant as "Salvador" consistent with how he refers to himself in his briefing to us. See United States v. Rosa-Borges, 101 F.4th 66, 68 n.1 (1st Cir. 2024).

- 2 -

use a minor to commit the offense or assist in avoiding detection of, or apprehension for, the offense. We therefore conclude that, although the District Court properly applied existing precedent, Patrick does not provide a basis for applying § 3B1.4's upward adjustment to Salvador.

We reach this conclusion because, by its own terms, an adjustment may be determined based on the conduct described in § 1B1.3 only if the Guidelines do not "otherwise specif[y]," and we agree with Salvador that § 3B1.4 "specifie[s]" that its upward adjustment may not be determined based on the conduct described in § 1B1.3(a)(1)(B). We nonetheless affirm Salvador's life sentence based on the sentencing judge's alternative determination that § 3B1.4's upward adjustment applies to Salvador because, by an affirmative act, he personally used a minor to commit the offense.

**I.**

**A.**

In October 2019, a federal grand jury in the District of Massachusetts returned a first superseding indictment against Salvador and five co-defendants. That indictment charged Salvador and the five other defendants with violating 18 U.S.C. § 1962(d), by conspiring to violate the Racketeering Influenced Corrupt Organization Act (RICO).

Section 1962(d) makes it unlawful to "conspire to violate any of the [substantive RICO] provisions," including by

- 3 -

conspiring to "conduct or participate . . . in the conduct" of an enterprise's affairs "through a pattern of racketeering activity." 18 U.S.C. § 1962(d), (c).  The first superseding indictment identified the relevant "enterprise" as MS-13,[3] which the indictment alleged "is one of the largest criminal organizations in the United States" and is "organized in Massachusetts and elsewhere in the form of so-called 'cliques,'" including the Sykos clique.

On May 20, 2021, the government filed a superseding information against Salvador.  It charged him with one count of RICO conspiracy in violation of 18 U.S.C. § 1962(d).  The superseding information alleged that Salvador, as "a person employed by and associated with MS-13," knowingly conspired "to conduct and participate . . . in the conduct of the affairs of the MS-13 enterprise through a pattern of racketeering activity."

RICO defines "racketeering activity" to include, among other things, murder, id. § 1961(1)(A), and also defines a "pattern of racketeering activity" as "at least two acts of racketeering activity," id. § 1961(5).  The superseding information identified the "means and methods" of the alleged RICO conspiracy as including two murders in which Salvador had allegedly participated: the

---

[3]  La Mara Salvatrucha, also known as MS-13, "is a transnational criminal organization based in El Salvador." United States v. Sandoval, 6 F.4th 63, 73 (1st Cir. 2021).

- 4 -

murder of Luis Orellano Ruano on or about December 24, 2016, and the murder of Herson Rivas on or about July 30, 2018.

**B.**

On June 24, 2021, Salvador pleaded guilty to the superseding information's one count of RICO conspiracy. He admitted in entering his plea that he had participated in the murders of both Ruano and Rivas.

The United States Probation Office ("Probation") prepared a presentence investigation report ("PSR"). Because the Ruano and Rivas murders were predicate racketeering acts for Salvador's RICO conspiracy conviction, the PSR determined Salvador's base offense level by relying on the base offense level for murder. See U.S.S.G. § 2E1.1(a)(2) & cmts. 1-2.

The PSR assigned Salvador an offense level of 43 for each murder. See id. § 2A1.1. Pursuant to § 3B1.4, the PSR then adjusted the base offense level assigned to the Rivas murder two levels upward on the ground that Salvador had used a minor to commit that murder. Accounting for both murders, the PSR calculated a combined offense level for Salvador of 47. See id. § 3D1.4. The PSR reduced the offense level by three levels, however, pursuant to § 3E1.1(a), based on Salvador's "acceptance of responsibility," and § 3E1.1(b), based on Salvador "timely notifying authorities of his intention to enter a [guilty] plea."

This reduction resulted in a total offense level for Salvador of 44.

The PSR went on to treat the total offense level of 44 as a total offense level of 43. See id. ch. 5, pt. A, cmt. 2 ("An offense level of more than 43 is to be treated as an offense level of 43."). The PSR explained that this total offense level, when combined with Salvador's criminal-history category, resulted in a Guidelines sentencing range for him of life imprisonment.

Salvador objected, among other things, to the PSR's recommendation that he was subject to § 3B1.4's two-level upward adjustment. He contended that he did not "use" a minor in the Rivas murder because he did not direct or lead a minor in committing the offense.

Probation responded that, under Patrick, in a case involving a conspiracy offense, § 3B1.4's upward adjustment may be determined based on a defendant reasonably foreseeing a co-conspirator's use of a minor in furtherance of the conspiracy. Probation contended that "it was reasonably foreseeable to [Salvador] that his co-defendants . . . would recruit juveniles to further [the] gang['s] activities." Probation thus argued that, under Patrick, the use-of-a-minor adjustment was applicable to Salvador. Probation also asserted that § 3B1.4's upward adjustment applied to Salvador because he was "an older and higher-ranking member of MS-13" and that he "likely had influence

over [] younger, impressionable juveniles, such that he encouraged and used them in his criminal activities, including the Rivas murder."

Salvador and the government filed sentencing memoranda with the District Court. Salvador's memorandum repeated his argument that § 3B1.4's upward adjustment did not apply to him. The memorandum contended that his total offense level should therefore be 42, not 43.

The memorandum noted that, given Salvador's criminal history, an offense level of 42 would yield a Guidelines sentencing range of 360 months to life imprisonment rather than life imprisonment. The memorandum asked the District Court to impose a sentence of 400 months.

The government argued in its sentencing memorandum that the "[G]uideline[s] sentencing range for [Salvador's] role in the MS-13 racketeering conspiracy is life in prison." The memorandum also argued that a life sentence was appropriate under 18 U.S.C. § 3553(a)'s sentencing factors because Salvador "brutally killed two teenagers," "showed little remorse for his crimes," and exhibited "deplorable conduct while in pretrial custody."

The government separately filed a response to Salvador's sentencing memorandum. The response relied on Patrick to argue that, in the case of a conspiracy offense, "a defendant does not need to have personally recruited or used minors to help facilitate

[the crime of conviction]" in order to be subject to § 3B1.4's adjustment, if such use of a minor by a co-conspirator was "reasonably foreseeable." The response further asserted that "an MS-13 homeboy like Salvador knew that the gang would use a minor to further the gang's activities" and that Salvador had "personally associated with multiple minors as part of the charged racketeering conspiracy," noting that, "[f]or example, the [PSR] discusses how the gang recruited and attempted to use CW-19, a juvenile (who was punished by Salvador and other [MS-13] members for his non-commitment to the gang)."

Salvador thereafter filed a brief with the District Court. He argued in the brief that Patrick was wrongly decided and that, even in the case of a conspiracy offense, for § 3B1.4's upward adjustment to apply to him, he must have, by an affirmative act, personally used the minor in committing the offense.

At sentencing, the District Court concluded that it was bound by Patrick. The District Court further concluded that "the Sykos clique of MS-13, which included [Salvador], had as a regular part of its mode of operating recruiting and training individuals under 18 to engage in violent crimes in furtherance of the RICO conspiracy." Thus, it determined that because Salvador "knew this

- 8 -

and foresaw that minors would be used in the ongoing commission of that crime," § 3B1.4's upward adjustment applied to him.[4]

In an alternative ruling, the District Court determined that § 3B1.4's upward adjustment applied to Salvador on the independent ground that he had "personally" used a minor to commit the offense. The basis for this determination was, in part, the finding that Salvador told a minor "to '[m]ove over' during the Rivas murder," as the District Court determined that this statement was "a form of directing a minor" in the murder. The District Court then also found that Salvador had personally used a minor to commit the offense because he personally participated in the recruitment and training of a minor by (1) talking to a minor about "MS-13's mode of operating," (2) showing a minor "a video of MS-13 activity which was essentially a recruitment video," and (3) beating a minor, along with other MS-13 members, as "part of [MS-13]'s training, teaching [that minor] the rules."

The District Court stated several times that the application of § 3B1.4's upward adjustment to Salvador and his co-defendants would not "make a difference" to the sentences imposed,

---

[4] The District Court also concluded, for much the same reasons, that § 3B1.4's upward adjustment applied to Salvador's co-defendants, whose sentences were at issue in the same hearing. See United States v. Salvador-Gutierrez, 79 F.4th 198, 202 (1st Cir. 2023), withdrawn, reh'g granted, 2024 WL 424446 (1st Cir. Feb. 1, 2024). This appeal, however, concerns only the application of § 3B1.4 to Salvador, and so we confine our discussion to those findings that concerned his sentence.

which would be driven by an assessment of the § 3553(a) sentencing factors.  But the District Court "reserve[d]" the issue and, before the final day of sentencing, issued an order that acknowledged the government's position that the asserted use of a minor "should make a difference" to the sentences imposed and directed the parties to be prepared to address "whether the use of a minor as part of the RICO conspiracy to which each defendant pled guilty is material to what sentence is sufficient and no more than necessary . . . in order to serve the statutory purposes of sentencing" (citing 18 U.S.C. § 3553(a)).  Moreover, on the final day of sentencing, the District Court confirmed that the application of § 3B1.4's adjustment to Salvador resulted in his Guidelines sentencing range being life imprisonment.  In addition, when Salvador at that point again objected to the application of § 3B1.4's upward adjustment to him, the District Court responded, "That's fine.  I don't know what the First Circuit would say if you appeal, so that's prudent" (emphasis added).

After hearing argument and Salvador's allocution, the District Court imposed a sentence of life imprisonment on Salvador. The District Court expressly considered the § 3553(a) sentencing factors and recognized the hardships of Salvador's upbringing in El Salvador.  The District Court concluded, however, that Salvador was an "enthusiastic" member of MS-13, had willingly joined the Sykos clique, and had participated in two murders.  The District

Court also explained that it had "searched to see whether there [was] really anything in view of all the factors that weigh in favor of a life sentence that weighed sufficiently in favor of a lower sentence, and [it] couldn't find them."

## C.

Salvador appealed his sentence. He did so by arguing that Patrick was wrongly decided and that, in consequence, the District Court erred in applying § 3B1.4's upward adjustment to him based on Patrick.

The government contended in response that Patrick was right. In addition, the government argued that Salvador's sentencing challenge "alternatively fails because the district court found that he directed [a minor] during Rivas's murder when he told [the minor] to '[m]ove over.'" "Hence," the government contended, "even if contra Patrick, § 3B1.4 were interpreted to require that a defendant personally use or attempt to use a minor in the course of committing the offense of conviction, as Salvador urges here, that condition was satisfied in this case."

In his reply brief, Salvador again argued that Patrick was wrong. But he also challenged, for the first time on appeal, the District Court's alternative conclusion that Salvador personally used a minor to commit the offense when he told a minor to "move over" during the commission of the Rivas murder.

A panel of this Court affirmed. United States v. Salvador-Gutierrez, 79 F.4th 198 (1st Cir. 2023), withdrawn, reh'g granted, 2024 WL 424446 (1st Cir. Feb. 1, 2024). The panel explained that, under the law-of-the-circuit doctrine, it was bound by Patrick. The panel went on to explain that, as a result, § 3B1.4's upward adjustment could be applied to Salvador based on the reasonably foreseeable use of a minor by one of Salvador's co-conspirators that was both within the scope of, and in furtherance of, the conspiracy. Id. at 204-05 (citing Nevor v. Moneypenny Holdings, LLC, 842 F.3d 113, 125 (1st Cir. 2016)). The panel also rejected Salvador's challenge to the application of the adjustment based on his "move over" statement, because the panel determined that Salvador waived that ground for challenge by raising it for the first time in his reply brief.[5] Id. at 205; see Sparkle Hill, Inc. v. Interstate Mat Corp., 788 F.3d 25, 29 (1st Cir. 2015) ("Our precedent is clear: we do not consider arguments for reversing a decision of a district court when the argument is not raised in a party's opening brief.").

**D.**

Following the panel's decision, Salvador filed a petition for rehearing en banc. The petition requested that we

---

[5] The government did not advance any arguments to the panel regarding Salvador's personal use of a minor beyond the "move over" statement.

reconsider Patrick and vacate Salvador's sentence due to what Salvador contended was the erroneous application of § 3B1.4's upward adjustment to him. We granted the petition, vacated the panel's judgment, requested supplemental briefing, and heard oral argument.

## II.

We review a sentencing court's findings of fact for clear error. United States v. Misla-Aldarondo, 478 F.3d 52, 70 (1st Cir. 2007); United States v. Dixon, 449 F.3d 194, 200-01 (1st Cir. 2006). We review de novo questions of law involved in sentencing determinations. United States v. Pho, 433 F.3d 53, 60 (1st Cir. 2006). The proper interpretation of a guideline is a question of law. United States v. Hercules, 947 F.3d 3, 7 (1st Cir. 2020).

## III.

Salvador does not challenge the District Court's factual finding that it was reasonably foreseeable that one of his co-conspirators would use a minor within the scope of, and in furtherance of, the conspiracy. Thus, if Patrick remains good law, then we would be required to affirm Salvador's sentence based on the District Court's Patrick-based ground for applying § 3B1.4's upward adjustment to Salvador. In that event, moreover, we would not need to address the various record-based challenges that Salvador makes to the District Court's alternative, personal-use-based ground for subjecting him to § 3B1.4's upward

- 13 -

adjustment.  Accordingly, we begin by addressing Salvador's contention that Patrick was wrongly decided and so must be overruled.[6]

This contention implicates both § 3B1.4 itself and, as noted above, the additional guideline that Patrick relied on: § 1B1.3, titled "Relevant Conduct (Factors that Determine the Guideline Range)."  See 248 F.3d at 28.  We therefore need to describe both guidelines in greater detail before we assess the parties' arguments about how best to construe those guidelines.

**A.**

Section 1B1.3 appears in Part B of Chapter One of the Guidelines, which sets forth "[g]eneral [a]pplication [p]rinciples."  Id. ch. 1, pt. B.  The guideline lays out one such set of principles by providing, in pertinent part:

---

[6] We agree with Salvador that, insofar as there was a miscalculation of his Guidelines sentencing range by the District Court due to its application of § 3B1.4's upward adjustment under Patrick, the miscalculation may not be deemed harmless on the ground that the District Court made clear that the same sentence would have been imposed regardless of the applicable Guidelines sentencing range.  After first indicating that the adjustment would not impact Salvador's sentence, the District Court instructed the parties to be prepared to address whether the use of a minor should "make a difference."  Then, before imposing the sentence, the District Court stated that it was "prudent" for Salvador to object to the application of § 3B1.4's upward adjustment so that he could preserve a challenge to its application on appeal.  As a result, we conclude that the District Court did not "make[] clear that it would have entered the same sentence regardless of the [g]uideline."  United States v. Ouellette, 985 F.3d 107, 110 (1st Cir. 2021).

(a) . . . Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:

(1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were --

(i) within the scope of the jointly undertaken criminal activity,

(ii) in furtherance of that criminal activity, and

(iii) reasonably foreseeable in connection with that criminal activity;

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense . . . .

Id. § 1B1.3(a).

Section 1B1.3 expressly provides that its instructions regarding "[r]elevant [c]onduct" do not apply if "otherwise specified." Id. Consistent with this proviso, the commentary to § 1B1.3 explains that this guideline only "establishes a rule of construction, by specifying, in the absence of more explicit instructions in the context of a specific guideline, the range of conduct that is relevant to determining the [defendant's]

applicable offense level."  Id. § 1B1.3 background cmt. (emphasis added).

Section 1B1.3 sets forth its default rule of construction through its subsections.  Two of them are key for present purposes -- § 1B1.3(a)(1)(A) and § 1B1.3(a)(1)(B).

Subsection 1B1.3(a)(1)(A), the first of § 1B1.3(a)(1)'s relevant subsections, borrows from federal law's approach to assigning criminal aiding-and-abetting liability.  That approach makes a defendant "punishable as a principal" if the defendant "aids, abets, counsels, commands, induces, [] procures," or "willfully causes" the commission of an offense.  18 U.S.C. § 2. Subsection 1B1.3(a)(1)(A) provides that, in general, the adjustments[7] in Chapters Two and Three of the Guidelines are to be determined based not only on "all acts and omissions" that the defendant committed but also on those that the defendant "aided, abetted, counseled, commanded, induced, procured, or willfully caused."  U.S.S.G. § 1B1.3(a)(1)(A).

---

[7] Section 1B1.3 refers to "specific offense characteristics . . . in Chapter Two" and "adjustments in Chapter Three."  Because the "specific offense characteristics" set forth in Chapter Two also "adjust" the defendant's offense level, U.S.S.G. ch. 2, introductory cmt., they are commonly referred to -- both by the Guidelines and by the courts -- as "adjustments," see, e.g., id. § 2A4.1 background cmt.; United States v. Garcia-Torres, 341 F.3d 61, 76 (1st Cir. 2003).  We therefore use the term "adjustments" to refer to both "adjustments" like § 3B1.4 and "specific offense characteristics" in Chapter Two.

- 16 -

Subsection 1B1.3(a)(1)(B) augments § 1B1.3(a)(1)(A) by borrowing from the approach for assigning _Pinkerton_ criminal liability.[8]  Under _Pinkerton_, a defendant is "criminally liable for the substantive offenses committed by his co-conspirators during the course of and in furtherance of the conspiracy," _United States_ v. _Hansen_, 434 F.3d 92, 103 (1st Cir. 2006), so long as the offenses could be "reasonably foreseen as a necessary or natural consequence of the unlawful agreement," _Pinkerton_ v. _United States_, 328 U.S. 640, 648 (1946).  Subsection 1B1.3(a)(1)(B) provides that, in general, in the case of "jointly undertaken criminal activity," the adjustments in Chapters Two and Three of the Guidelines are also to be determined based on "all acts and omissions of others" that were "within the scope of the jointly undertaken criminal activity, [] in furtherance of that criminal activity, and [] reasonably foreseeable in connection with that criminal activity."  U.S.S.G. § 1B1.3(a)(1)(B).

Even though § 1B1.3 in this way draws from concepts relevant to assigning criminal liability, the commentary to that guideline expressly states that "[t]he principles and limits of sentencing accountability under this guideline are not always the

---

[8] Nonetheless, the two are not coextensive, as _Pinkerton_ liability is, "in some cases, broader than relevant conduct" under § 1B1.3(a)(1)(B).  _United States_ v. _Rodriguez_, 731 F.3d 20, 29 (1st Cir. 2013) (citing _United States_ v. _Laboy_, 351 F.3d 578, 583 (1st Cir. 2003)).

same as the principles and limits of criminal liability." Id. § 1B1.3 cmt. 1. The commentary explains that, in identifying the defendant's Guidelines sentencing range, the focus must be on "the specific acts and omissions" that the Guidelines deem relevant, not on "whether the defendant is criminally liable for an offense as a principal, accomplice, or conspirator." Id.; cf. id. ch. 1, pt. A, 1(4)(a) (explaining that the Guidelines, by taking into account "real offense elements such as role in the offense," diverge from a system of "pure" charge-offense sentencing).

Of course, the Guidelines' instructions include more than § 1B1.3. They also include the individual guidelines on which § 1B1.3 operates. Before we take up the parties' arguments regarding Patrick, therefore, we also need to say more about the relevant adjustment-setting guideline here: § 3B1.4.

The guideline appears in Part B of Chapter Three of the Guidelines -- the chapter that sets forth "adjustments" to the defendant's offense level applicable to a variety of offenses. Part B is titled "Role in the Offense." According to the introductory commentary to Part B, that part specifically sets forth "adjustments . . . based upon the role the defendant played in committing the offense." Id. ch. 3, pt. B, introductory cmt.

Also of potential significance, § 3B1.4 uses "defendant"-specific language in setting forth its upward adjustment. It does so by providing that "[i]f the defendant used

- 18 -

or attempted to use a person less than eighteen years of age to commit the offense or assist in avoiding detection of, or apprehension for, the offense, increase [the defendant's offense level] by 2 levels." Id. § 3B1.4 (emphasis added).[9]

**B.**

Salvador contends that § 1B1.3(a)(1)(B)'s Pinkerton-like default rule for assigning sentencing accountability does not apply to § 3B1.4 because, in accordance with § 1B1.3, § 3B1.4 "specifie[s]" "otherwise." See id. § 1B1.3(a) ("Unless otherwise specified . . . adjustments in Chapter Three[] shall be determined on the basis of the following . . . ."). According to Salvador, § 3B1.4 "specifie[s]" that its upward adjustment is only to be applied based on the defendant's personal conduct, and not based on the merely reasonably foreseeable conduct of others.[10] Thus, Salvador argues that, even with respect to jointly undertaken criminal activity, he may not be subject to § 3B1.4's upward adjustment based solely on the reasonably foreseeable use of a minor by another participant in that activity that is within the scope of, and in furtherance of, that activity. Rather, Salvador

---

[9] The guideline does have application notes appended to it. However, they do not refer, even implicitly, to § 1B1.3 either in whole or in part.

[10] Salvador does not contend that the reference in § 1B1.3(a)(1)(B) to "others" in and of itself renders that subsection inapplicable to a guideline focused on "the defendant."

argues that he may be subject to § 3B1.4's upward adjustment only if, by an affirmative act, he personally used a minor or attempted to use a minor to commit the offense, or assist in avoiding detection of, or apprehension for, the offense.

To make the case that § 3B1.4 "otherwise specifie[s]," Salvador relies on both the Commission's choice to expressly designate § 3B1.4 as a "Role in the Offense" guideline and § 3B1.4's specific reference to "the defendant" as the person who must have used or attempted to use a minor. He notes that, based on these same grounds, other courts have held that § 3B1.4 must be construed as he contends that it must. See United States v. Pojilenko, 416 F.3d 243, 248-49 (3d Cir. 2005); United States v. Acosta, 474 F.3d 999, 1002-03 (7th Cir. 2007).

In assessing Salvador's challenge to his sentence, we thus must decide whether the Commission "specified" that § 3B1.4's upward adjustment may be determined based only on a narrower range of conduct than § 1B1.3 otherwise would require. For the reasons set forth below, we conclude that the Commission did so "specif[y]," and thus that Patrick must be overruled, such that § 3B1.4's upward adjustment may not be applied to Salvador based on the reasonably foreseeable use of a minor by another member of the conspiracy.[11]

---

[11] In accordance with § 1B1.3(a)(1)(A), we understand

**1.**

We begin with the meaning of the word "specified" in § 1B1.3(a). The Guidelines themselves do not define the word. We therefore consider its ordinary meaning, while looking for additional guidance from both our prior cases' assessment of the word's ordinary meaning and applicable commentary in the Guidelines, see United States v. Carbajal-Váldez, 874 F.3d 778, 784 (1st Cir. 2017) (explaining that "undefined terms in the [G]uidelines should customarily be given their plain and ordinary meaning"); see also United States v. Daniells, 79 F.4th 57, 89 (1st Cir. 2023) ("We interpret the guidelines, as well as the Sentencing Commission's commentary, including application notes, 'using conventional methods of statutory construction.'" (quoting United States v. Damon, 595 F.3d 395, 400 n.3 (1st Cir. 2010))), insofar as that commentary is not inconsistent with the text of

---

§ 3B1.4's upward adjustment to apply not only when the use of the minor "to commit the offense or assist in avoiding detection of, or apprehension for, the offense," U.S.S.G. § 3B1.4, was "committed" by the defendant, but also when the defendant "aided, abetted, counseled, commanded, induced, procured, or willfully caused" such use, id. § 1B1.3(a)(1)(A). Salvador does not argue otherwise, and we note that this understanding accords with how the application notes to other guidelines use the words "the defendant." See, e.g., id. § 3B1.5 cmt. 2 ("[T]he term 'defendant' . . . limits the accountability of the defendant to the defendant's own conduct and conduct that the defendant aided or abetted, counseled, commanded, induced, procured, or willfully caused.").

the guideline itself, see Stinson v. United States, 508 U.S. 36, 42-43 (1993).

As a matter of ordinary meaning, "specify" means "to state explicitly." Webster's II New Riverside Univ. Dictionary 1116 (1988); see also Kucana v. Holder, 558 U.S. 233, 243 n.10 (2010) ("'[S]pecify' means 'to name or state explicitly or in detail[.]'" (quoting Webster's New Collegiate Dictionary 1116 (1974))); Bernardo ex rel. M&K Eng'g, Inc. v. Johnson, 814 F.3d 481, 486 (1st Cir. 2016) (citing Kucana, 558 U.S. at 243 n.10). We have made clear that a provision of law may "specify" -- and thus "state explicitly" -- without including any express reference to the thing that must be specified. See Bernardo, 814 F.3d at 486 (concluding, in the context of a statute that requires authority to have been "specified" to be discretionary, that, to the extent petitioner's argument "rest[s] on a notion that 'specified' means that Congress must use the word 'discretion' for a decision to be discretionary," that position has been rejected by the Supreme Court (citing Kucana, 558 U.S. at 247 n.13)); cf. Spencer Enters., Inc. v. United States, 345 F.3d 683, 690 (9th Cir. 2003) (observing, based on the fact that the Attorney General "may grant asylum," that such is "[a]nother example of the type of decision[] whose authority is specified by statute to be entirely discretionary" (citation omitted)).

So, as a matter of ordinary meaning, to "specif[y]" "otherwise" with respect to any or all the conduct described in § 1B1.3, an adjustment-setting guideline need not mention § 1B1.3 by name or quote from its text. To the contrary, the Guidelines may "specif[y]" "otherwise" through language that is best read as an explicit instruction to adjust the defendant's offense level based on a different (or narrower) range of conduct than the conduct specified in § 1B1.3. See U.S.S.G. § 1B1.3 background cmt. (characterizing § 1B1.3(a) as "establish[ing] a rule of construction by specifying, in the absence of more explicit instructions in the context of a specific guideline, the range of conduct that is relevant to determining the applicable offense level"); see also, e.g., United States v. Drapeau, 121 F.3d 344, 349 (8th Cir. 1997) (explaining that the use of the term "offense of conviction" in place of "offense" in U.S.S.G. § 3A1.2(a) "specifies that only the offense of conviction is to be considered," rather than the full scope of relevant conduct under § 1B1.3).

Against this backdrop, we must determine whether the Commission made the requisite explicit instruction as to § 1B1.3(a)(1)(B)'s application through the designation of § 3B1.4 as a "Role in the Offense" guideline and the express reference in § 3B1.4 to "the defendant" as the person who "used" or "attempted to use" a minor. Because our concern is, in the end, only with

- 23 -

§ 3B1.4, and not with every adjustment-setting guideline that uses similarly "defendant"-specific language, we first address the Commission's decision to designate § 3B1.4 as a "Role in the Offense" guideline, before we then address the import of that guideline's reference to "the defendant" as the one who used or attempted to use a minor.

## 2.

Part B of Chapter Three is titled, "Role in the Offense." The Commission thereby expressed its intention, as the accompanying introductory commentary to Part B confirms, that, unlike other guidelines, each of the "Role in the Offense" guidelines adjusts the defendant's offense level based specifically on the defendant's "[r]ole in the [o]ffense" and not some characteristic of the offense itself. In this regard, the introductory commentary states that the guidelines contained in Part B provide adjustments to the defendant's offense level "based upon the role the defendant played in committing the offense." Id. ch. 3, pt. B, introductory cmt. (emphasis added). Thus, whereas § 1B1.3(a)(1)(B)'s default definition of relevant conduct aggregates and makes relevant all reasonably foreseeable conduct in furtherance and within the scope of jointly undertaken criminal activity, the "Role in the Offense" guidelines distinguish among participants in jointly undertaken criminal activity by providing

for adjustments based on the specific "role" "played" by "the defendant."  Id. ch. 3, pt. B, introductory cmt.

Indeed, consistent with the title and the introductory commentary, all the "Role in the Offense" guidelines set forth adjustments using "defendant"-specific language, even though the Guidelines do not typically use such language in setting forth adjustments.[12]  Instead, the Commission generally defines when an adjustment applies by identifying the conduct that triggers the adjustment without specifying who must have engaged in that conduct.  For example, adjustment-setting guidelines often provide that the offense level should be increased so long as "the offense involved" the adjustment-triggering conduct.[13]  See, e.g., U.S.S.G. § 2A2.1(b)(2) ("If the offense involved the offer or the receipt of anything of pecuniary value . . . ."); id. § 2G3.1(b)(1)(C) ("If the offense involved distribution to a minor . . . .); id. § 3A1.4 ("If the offense . . . involved or was intended to promote, a federal crime of terrorism . . . ."); cf. Dean v. United States,

_____

[12] Even § 3B1.5, which is the final "Role in the Offense" guideline, provides for an upward adjustment when "the defendant" uses body armor above what that adjustment would be if the record showed merely that "the offense involved" the use of body armor.

[13] Even in the absence of a reference to "the offense," adjustments still typically leave unspecified who must commit the adjustment-triggering conduct.  See, e.g., U.S.S.G. § 2B2.1(b)(4) ("If a dangerous weapon (including a firearm) was possessed . . . ."); id. § 2A3.2(b)(3) ("If a computer or an interactive computer service was used . . . ."); id. § 3A1.3 ("If a victim was physically restrained . . . .").

- 25 -

556 U.S. 568, 572 (2009) (use of the passive voice "focuses on an event that occurs without respect to a specific actor," and therefore "reflects 'agnosticism . . . about who does the [act]'" (quoting Watson v. United States, 552 U.S. 74, 81 (2007)) (alteration in original)).

Thus, in accord with the Commission's own explanation of the "Role in the Offense" guidelines, § 3B1.4 is not naturally construed to adjust the defendant's offense level based on the merely reasonably foreseeable conduct of others rather than the personal conduct of the defendant. The "role" someone "played" in committing an offense more naturally refers to what that individual participant did rather than to what that participant reasonably foresaw that another participant would do. It thus makes little sense to say that someone "play[s]" a specified "role" in an offense involving jointly undertaken criminal activity -- here, the role of using a minor in committing the offense -- by merely reasonably foreseeing that others engaged in that joint activity would play that role. See Acosta, 474 F.3d at 1003 ("Pinkerton liability makes no sense in the context of the individualized enhancements set out in [Chapter Three, Part B] of the Guidelines, which seek to punish the particular behavior of individual members of a conspiracy.").

This conclusion accords with the text of § 3B1.4 itself, which instructs us to focus on "the defendant" and that

individual's "use[]" -- or attempted use -- of a minor to commit the offense.  U.S.S.G. § 3B1.4.  The ordinary meaning of the word "defendant" refers to "[o]ne against whom an action is brought." Webster's II New Riverside Univ. Dictionary 356 (1988); see also Carbajal-Váldez, 874 F.3d at 784 (giving undefined Guidelines terms their "ordinary meaning").  The definite article "the" to identify the person so accused in § 3B1.4 thus supports the conclusion that the guideline explicitly instructs that the defendant's offense level is to be increased only if "the defendant" used or attempted to use a minor in the specified way and not also, in the case of joint criminal activity, merely because it was reasonably foreseeable that some other person, acting within the scope of and in furtherance of that activity, would use a minor in that way.  See U.S. Sugar Corp. v. EPA, 113 F.4th 984, 993 (D.C. Cir. 2024) ("Congress's choice between a definite and indefinite article matters when determining statutory meaning."); see also, e.g., Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys., 603 U.S. 799, 817-18 (2024) (explaining that "the plaintiff" refers to "this particular plaintiff").

It is noteworthy in this regard that, unlike the term "defendant," which the Guidelines do not define, the much more commonly used "[o]ffense" is explicitly defined in the Guidelines as "the offense of conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning is specified

or is otherwise clear from the context." Id. § 1B1.1 cmt. 1(I) (emphasis added). The Commission's choice to deploy the "defendant used" language in § 3B1.4 is therefore hard to understand if, as the government maintains, the Commission intended to pick up the full scope of § 1B1.3 in that guideline. The use of the Commission's more typical "offense involved" language would have made that intention perfectly clear.

We do recognize that the default rule that § 1B1.3 sets forth is modeled, at least in part, on Pinkerton. We recognize, too, that, in the context of criminal liability, Pinkerton makes a person accountable for certain reasonably foreseeable conduct of others even if, as a textual matter, the statute that sets forth the offense focuses on the individual offender. See, e.g., United States v. Flecha-Maldonado, 373 F.3d 170, 179 (1st Cir. 2004) ("We have repeatedly held that under Pinkerton, the defendant does not need to have carried the gun himself to be liable under § 924(c) . . . [because Pinkerton allows him to be] held liable as if he himself carried or used the firearm." (citations omitted)).

Pinkerton did not purport to interpret the phrase "the defendant used," however, let alone to interpret those words in a provision aimed at identifying "the role played" by the defendant relative to others. In fact, Pinkerton did not purport even to have any bearing on issues related to sentencing, as opposed to criminal liability.

Moreover, as we have seen, the commentary to § 1B1.3 is express in stating that § 1B1.3's function is to assign accountability in sentencing, not to mimic criminal liability. U.S.S.G. § 1B1.3 cmt. 1. Nor is anything in § 1B1.3 inconsistent with that commentary.

We therefore do not see why, in assessing the impact of the Commission's decision to use the words "the defendant used" in this expressly designated "Role in the Offense" guideline, we have any reason to depart from the ordinary meaning of that phrase and to instead adopt a specialized meaning gleaned inferentially from Pinkerton. In that regard, we emphasize that § 1B1.3, in adopting Pinkerton-like accountability at sentencing, establishes what is only a default rule of construction, precisely because its rule does not apply if a guideline "otherwise specifie[s]." Id. § 1B1.3(a). And nothing in § 1B1.3 instructs us, in assessing whether such a specification has in fact been made, to depart from the ordinary meaning of "specif[y]," or, for that matter, from the ordinary meaning of "the defendant used" or "the role played by the defendant."

Consistent with this conclusion, we note that the government concedes that the first two "Role in the Offense" guidelines -- which provide for adjustments based on whether "the defendant" played an "aggravating" or "mitigating" role in the offense, id. §§ 3B1.1, 3B1.2, -- cannot be applied, in

Pinkerton-like fashion, based on "the defendant" having reasonably foreseen that another member of the conspiracy would play such an aggravating or mitigating role. The government does contend that those two "Role in the Offense" guidelines are different from § 3B1.4 in a relevant respect because their adjustments are triggered by "status" rather than conduct. On that basis, the government asserts that no specification at all is necessary to leave § 1B1.3(a)(1)(B) without effect as to those two guidelines, even though a specification is necessary for a conduct-based guideline like § 3B1.4.

We are not persuaded by the government's asserted ground for distinguishing these two "Role in the Offense" guidelines from § 3B1.4. Section 1B1.3 provides that it governs how "all" Chapter Three adjustments are to be determined, subject only to the possibility that the guideline in question "otherwise specifie[s]" (emphasis added). Section 1B1.3 further provides that "all" such adjustments are to be determined based on "acts or omissions" -- which is to say, conduct. We thus fail to see how the government could be right that § 3B1.1 and § 3B1.2 do not make a defendant accountable for the conduct § 1B1.3(a)(1)(B) describes even if they in no way "specif[y]" that this is the case.

Of course, those guidelines do trigger their adjustments based on what "the defendant was," id. §§ 3B1.1, 3B1.2, rather than on whom "the defendant used," id. § 3B1.4. But we see no

basis for concluding that the Commission intended, by using the phrase "the defendant was," to "specif[y]" that a "Role in the Offense" guideline may not be applied based on another member of the conspiracy foreseeably playing that role, but not by using the equally "defendant"-specific phrase "the defendant used."

Reinforcing this conclusion are other signs in the Guidelines that indicate that the Commission understands "the defendant used" formulation in § 3B1.4 to have the import that Salvador contends that it does.  For example, the Commission has amended the language of certain adjustment-setting guidelines to substitute references to "the defendant" with references to "the offense."  In doing so, the Commission has explained that it has made the change out of a concern that the use of the term "the defendant" rather than "the offense" "could be construed as a limitation on the scope of conduct for which a defendant is accountable under § 1B1.3."  U.S.S.G. amend. 480 (amending U.S.S.G. §§ 2A5.2, 2A6.1); see also United States v. Zarate-Suarez, 970 F.3d 1330, 1333 & n.5 (10th Cir. 2020) (Phillips, J., concurring in part and dissenting in part) (stating that "[w]hen a Guideline enhancement requires a showing that the defendant has done a specific act, the Guidelines have 'otherwise specified' that § 1B1.3(a)(1)(B) does not apply," and noting that the Sentencing Commission has stated the same in its training materials).

In addition, the Commission sometimes refers to conduct undertaken by "the defendant, or a person for whose conduct the defendant is accountable under § 1B1.3." Id. § 2D1.1(b)(7) (emphasis added); see also, e.g., id. §§ 2D1.11(b)(4), 2D1.12(b)(3), 3A1.2(c). If the government were right that the Commission's use of the term "defendant" in a guideline necessarily encompasses all the conduct outlined in § 1B1.3, then the phrase "or a person for whose conduct the defendant is accountable" would be wholly superfluous.

Finally, the Commission has appended application notes to various adjustment-setting guidelines that expressly single out the use of the term "defendant" as a word that "limits" the range of conduct for which the defendant is accountable.[14] See, e.g., id. §§ 3B1.5 cmt. 2, 2K2.1 cmt. 13(B), 2K2.6 cmt. 1(A). We ordinarily do not attribute a different meaning, however, to the same word when used in different guidelines. See Cochise Consultancy, Inc. v. United States ex rel. Hunt, 587 U.S. 262, 268 (2019).

All that said, we emphasize that our concern here is only with § 3B1.4, which is expressly designated a "Role in the Offense" guideline. Thus, we have no occasion to address the

_____

[14] For the reasons discussed below, we also do not ascribe the significance that the government urges to the absence of a similar application note to § 3B1.4. See infra Section III.B.3.

- 32 -

import of similarly "defendant"-specific language in setting forth an adjustment that is not so designated. Rather, we conclude only that, given the designation of § 3B1.4 as a "Role in the Offense" guideline and the "defendant"-specific language that it employs, that guideline has "specified" "otherwise" in accordance with § 1B1.3(a).

Nor, we should add, is this a case in which following the text, and considering that text in context, yields an absurd result. Even in the case of joint criminal activity, we cannot say that there are no rational reasons to distinguish, in assigning sentencing accountability, between personally doing something wrong and merely reasonably foreseeing that others, acting within the scope of and in furtherance of that activity, may do that thing. Indeed, even apart from what the text of each of the "Role in the Offense" guidelines indicates, we know that, following Patrick, the Commission made plain its intent that § 1B1.3(a)(1)(B)'s default not apply to a newly added "Role in the Offense" guideline, despite that guideline being just as conduct-focused as § 3B1.4. See U.S.S.G. § 3B1.5 cmt. 2 ("Consistent with § 1B1.3 (Relevant Conduct), the term 'defendant,' for the purposes of subdivision (2)(B), limits the accountability of the defendant to [the conduct specified in § 1B1.3(a)(1)(A)]."). In addition, as we have noted, the government itself concedes that § 1Bl.3's default rule does not

apply to two other "Role in the Offense" guidelines. See id. §§ 3B1.1, 3B1.2. Thus, given the Commission's stated purpose of differentiating between roles within an offense, we cannot say that it would be absurd for the Commission to have declined to apply § 3B1.4's conduct-based adjustment to a defendant involved in joint criminal activity based only on what was reasonably foreseeable that another participant would do.

Accordingly, contrary to Patrick, we construe § 3B1.4 to "otherwise" "specif[y]" that § 1B1.3(a)(1)(B) does not apply to the upward adjustment that it sets forth. We therefore conclude that § 3B1.4 reaches only those circumstances in which "the defendant," by some affirmative act, personally used or attempted to use a minor to commit the offense or assist in avoiding detection of, or apprehension for, the offense.

**3.**

Our conclusion regarding § 3B1.4 accords with the conclusion that other circuits have reached, see Pojilenko, 416 F.3d at 248-49; Acosta, 474 F.3d at 1002-03, although we acknowledge that some circuits have sided with Patrick, see United States v. Lewis, 386 F.3d 475, 479-80 (2d Cir. 2004); United States v. McClain, 252 F.3d 1279, 1287-88 (11th Cir. 2001); United States v. Voegtlin, 437 F.3d 741, 747 (8th Cir. 2006). Nonetheless, neither Patrick nor any of those circuits addressed whether the use of "defendant"-specific language in § 3B1.4, given its

designation as a "Role in the Offense" guideline, "otherwise specifie[s]" within the meaning of § 1B1.3. Thus, these precedents do not persuade us to read § 3B1.4 in the expansive manner that the government favors.

For its part, the government advances some reasons that Patrick did not give for why § 3B1.4's designation as a "Role in the Offense" guideline and its "defendant"-specific language fails to "specif[y]" with respect to § 1B1.3(a)(1)(B). However, we are not persuaded by those reasons.

To start, the government is right that the Introductory Commentary to Part B of Chapter Three provides that "[t]he determination of a defendant's role in the offense is to be made on the basis of all conduct within the scope of § 1B1.3 (Relevant Conduct), i.e., all conduct included under § 1B1.3(a)(1)-(4), and not solely on the basis of elements and acts cited in the count of conviction." U.S.S.G. ch. 3, pt. B, introductory cmt. We do not understand this instruction, however, to bear on how the guidelines contained in this part may, consistent with § 1B1.3(a), "specif[y]" "otherwise" regarding the range of conduct relevant to a particular determination. Nor do we understand this instruction to preclude a "Role in the Offense" guideline from so specifying -- a conclusion that would be at odds with not only the "aggravating"- and "mitigating"-role guidelines contained in that

- 35 -

part but also § 1B1.3(a) itself, which plainly allows for such a specification.  See id. §§ 3B1.1, 3B1.2.

Instead, we understand this introductory commentary to emphasize that, in line with the Guidelines' general approach, the adjustments contained in the "Role in the Offense" part may take into account conduct that is not an "element[] [or] act[] cited in the count of conviction," so long as that conduct is "relevant conduct" under one of the subsections of § 1B1.3(a)(1)-(4).  Id. ch. 3, pt. B, introductory cmt.; see also id. § 1B1.3 background cmt. ("Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range.").  Indeed, even when a defendant is accountable only for their own "role in the offense," a court may nonetheless need to look more broadly than the "elements and acts cited in the count of conviction," id. ch. 3, pt. B, introductory cmt., to identify the "offense" in question, and thereby the role played by the defendant in that offense.[15]  We therefore see no reason to conclude that this

---

[15] The Commission announced its intention to amend the introductory commentary to add the sentence in question in May 1990, see 55 Fed. Reg. 19202 (May 8, 1990), following decisions from multiple circuits concluding that the aggravating and mitigating role adjustments could only be applied by looking to the defendant's role in the offense of conviction, and not the role the defendant played in related criminal activity, see United States v. Williams, 891 F.2d 921, 925-26 (D.C. Cir. 1989); United States v. Williams, 879 F.2d 454, 458 (8th Cir. 1989); United

sentence of the introductory commentary bears on the precise question at hand, which concerns whether § 3B1.4 has "otherwise specified" that its adjustment applies only when "the defendant" personally used or attempted to use a minor and not merely when it was reasonably foreseeable that someone else would engage in that conduct.

In the end, then, the government's position reduces to the contention that we must infer that nothing in § 3B1.4 "otherwise specifie[s]" because that guideline lacks an application note stating that the defendant is not accountable for the merely reasonably foreseeable use of a minor by another. In arguing that this negative inference must be drawn, the government points out that other adjustment-setting guidelines use "defendant"-specific language and have application notes that expressly define the scope of the defendant's accountability to include § 1B1.3(a)(1)(A) and exclude § 1B1.3(a)(1)(B). See, e.g., id. §§ 3B1.5 cmt. 2, 3C1.1 cmt. 9, 3C1.2 cmt. 5, 2K2.1 cmt. 13(B),

States v. Tezlaff, 896 F.2d 1071, 1074 (7th Cir. 1990) (concluding that § 3B1.1's "role in the offense" adjustment could be applied only if the offense of which the defendant was convicted has as an "element . . . the participation of more than one person"); see also United States v. Nuno-Para, 877 F.2d 1409, 1413 (9th Cir. 1989) (explaining that § 3B1.2 and § 3B1.2 provide adjustments based on "the defendant's role in the offense of which he was convicted"); United States v. Pettit, 903 F.2d 1336, 1340-41 (10th Cir. 1990); Untied States v. Zweber, 913 F.2d 705, 708-09 (9th Cir. 1990).

2K2.6 cmt. 1(A).[16] The government contends that we must infer from the application notes to those guidelines that the use of "defendant"-specific language in § 3B1.4 -- along with its designation as a "Role in the Offense" guideline -- cannot have Salvador's claimed specifying effect. Otherwise, the government argues, the application notes to those other guidelines would be superfluous.

There is, however, good reason to conclude that the application notes that the government invokes are playing a clarifying function, such that those application notes do not establish that the use of "defendant"-specific language cannot itself be specifying. Indeed, when adding the application notes in question to two of the guidelines that the government cites -- § 3C1.1 and § 3C1.2 -- the Commission expressly stated that the purpose of the added application notes was to "clarif[y] the scope of conduct for which a defendant is accountable" under those guidelines. U.S.S.G. amend. 457 (1992) (emphasis added);

---

[16] Each application note cited by the government includes substantially identical language, although some notes purport to be "limit[ing]" the defendant's accountability, while others do not. Compare U.S.S.G. § 2K2.1 cmt. 13(B) ("The term 'defendant,' consistent with § 1B1.3 (Relevant Conduct), limits the accountability of the defendant to the defendant's own conduct and conduct that the defendant aided or abetted, counseled, commanded, induced, procured, or willfully caused."); with id. § 3C1.1 cmt. 9 ("Accountability for §1B1.3(a)(1)(A) Conduct.—Under this section, the defendant is accountable for the defendant's own conduct and for conduct that the defendant aided or abetted, counseled, commanded, induced, procured, or willfully caused.").

see also Young v. United Parcel Serv., Inc., 575 U.S. 206, 245-46 (2015) (Scalia, J., dissenting) ("[A] clarifying function easily overcomes any charge that the reading . . . makes the [relevant] clause 'superfluous, void, or insignificant.'" (citation omitted)).

Moreover, unlike § 3B1.4, those two guidelines also contain specific language tying their adjustments to the defendant having had a certain mental state. See U.S.S.G. § 3C1.1 ("If the defendant willfully . . . ."); id. § 3C1.2 ("If the defendant recklessly . . . ."). Thus, even if we were to assume that the "defendant"-specific language in those guidelines independently limits the defendant's accountability, it may be that the application notes are doing no more than clarifying questions that § 3B1.4 does not raise about the scope of conduct relevant to those guidelines. Thus, we do not see how those application notes support our drawing the negative inference that the government contends we must draw from the fact that § 3B1.4 has no similar application note.

The other guidelines to which the government points that are also not "Role in the Offense" guidelines are similar. They, too, contain language that § 3B1.4 does not contain that could cause confusion about the scope of a defendant's accountability.[17]

---

[17] For example, § 2D1.1(b)(16)(C) provides for an adjustment

So they, too, provide no basis for concluding that a concern about their application notes being superfluous requires the inference that § 3B1.4's "defendant"-specific language has no independent specifying effect.

True, the government does identify one guideline, § 3B1.5, that is designated a "Role in the Offense" guideline and that uses, in one of its two subsections, "defendant"-specific language like § 3B1.4. The government emphasizes that § 3B1.5, unlike § 3B1.4, nonetheless includes an application note making clear that, "for the purposes of [that] subdivision," the defendant is not accountable for the conduct encompassed by § 1B1.3(a)(1)(B). See U.S.S.G. § 3B1.5 cmt. 2. The government thus argues that the inclusion of such an application note to § 3B1.5 requires us to draw the negative inference that the use of "defendant"-specific language does not itself have any specifying

_____

if "the defendant was directly involved in the importation of a controlled substance" (emphasis added). Its application note appears to clarify that, notwithstanding the requirement of "direct[]" involvement, a defendant is nonetheless accountable under this section for the full scope of conduct under § 1B1.3(a)(1)(A). See id. § 2D1.1 cmt. 20(B). Likewise, when the Commission appended the relevant application note to § 2K2.1, that guideline expressly tied its application to "the defendant" having "engaged in the trafficking of firearms." See U.S.S.G. amend. 691 (2006). That application note thus appears to clarify that, notwithstanding the reference to trafficking (which, by its nature, often involves "joint criminal activity"), "the term 'defendant'" nonetheless "limits" the defendant's accountability to the conduct specified in § 1B1.3(a)(1)(A). See id.

effect, and that the absence of a similar application note to § 3B1.4 is therefore conclusive.

Unlike § 3B1.4, however, § 3B1.5 provides for two adjustments: a greater adjustment if "the defendant used" body armor, see id. § 3B1.5(2)(B), and a lesser adjustment if "the offense" merely "involved" such use, see id. § 3B1.5(2)(A). Thus, the application note in question appears simply to clarify the differing scope of the defendant's accountability under the two subsections of that guideline. Highlighting this distinction also would appear to be particularly apt in the context of § 3B1.5, as it is the only "Role in the Offense" guideline that provides for separate adjustments depending on whether "the offense involved" or "the defendant" engaged in the conduct specified.

Indeed, § 3B1.5 also includes a separate application note that defines the term "offense," id. § 3B1.5 cmt. 1 ("'Offense' has the meaning given that term in Application Note 1 of the Commentary to § 1B1.1 (Application Instructions)."), even though that application note merely restates the already-applicable definition of "offense" provided in Chapter One, see id. § 1B1.1 cmt. 1. As a result, that "offense"-defining application note is clearly doing no more than clarifying the meaning of that term. We thus see no reason to conclude that the

application note concerning the word "defendant" is doing anything different.  See id. § 3B1.5 cmt. 2.[18]

The government separately may mean to be arguing that we must glean from the various application notes that it foregrounds that § 3B1.4 cannot be construed to "specif[y]" "otherwise" with respect to the scope of relevant conduct because it does not expressly name § 1B1.3 or quote from its text.  After all, the various application notes that the government invokes all do just that.  This negative-inference-based argument, however, is hardly strong enough to compel the conclusion that the word "specif[y]" necessarily demands an instruction that mimics the application notes on which the government relies.

There remain all the reasons set forth above for concluding that the word "specif[y]" is best read to encompass an instruction that is explicit by other means.  And the government does not develop any argument apart from this

---

[18] The one guideline that the government identifies that presents no language obviously requiring clarification is § 2K2.6, which provides an upward adjustment very similar to § 3B1.5, "[i]f the defendant used . . . body armor in connection with another felony offense."  U.S.S.G. § 2K2.6(b)(1).  (Indeed, when § 2K2.6's upward adjustment applies, it renders § 3B1.5 "[i]napplicabl[e]." Id. § 2K2.6 cmt. 2.)  Notably, though, the Commission added § 2K2.6 to the Guidelines when § 3B1.5, with its application note, was already on the books.  Thus, because of the overlap between the two guidelines, and the fact that the adjustment contained in § 2K2.6 renders § 3B1.5 inapplicable, the fact that the Commission adopted an identical application note when adding § 2K2.6 suggests only that the Commission sought consistency between the two nearly identical guidelines -- itself a form of clarification.

negative-inference-based argument for concluding that the word "specif[y]" requires an instruction that mirrors the text of the application notes that it invokes.

Thus, at the very most, the application notes that the government cites would give rise to a grievous ambiguity about whether the word "specif[y]" demands an instruction that is explicit in the way that those notes are, or whether a differently worded instruction can be "explicit" through other means.[19] Id. § 1B1.3 & background cmt. In that event, however, we would have to apply the rule of lenity, Muscarello v. United States, 524 U.S. 125, 138-39 (1998); United States v. Bowen, 127 F.3d 9, 13 (1st Cir. 1997), which would counsel against our adopting an understanding of what "specif[y]" means that would rule out reading the "defendant"-specific language in § 3B1.4 to constitute such an explicit instruction, see United States v. Luna-Díaz, 222 F.3d 1, 3 n.2 (1st Cir. 2000) ("The rule of lenity requires that

---

[19] We emphasize that we do not see how the application notes that the government cites could give rise to any ambiguity about the meaning of the words "the defendant used" separate from the question of whether the meaning of the word "specif[y]" can encompass a specification by the use of such "defendant"-specific language. The application notes themselves suggest -- consistent with the ordinary meaning of "the defendant" -- that the term "defendant" is one of limitation. And so, an inference from those notes that the term "defendant" means something different when used in other guidelines is not compelled by the notes themselves and would require us -- contrary to our normal practice -- to attribute to the Commission an intention to use the word "defendant" to mean different things in different guidelines.

ambiguities . . . be resolved in favor of the criminal defendant."). So, even accounting for the government's arguments for adhering to Patrick, we agree with Salvador that he may not be subjected to § 3B1.4's upward adjustment based solely on it having been reasonably foreseeable that his co-conspirators would use a minor within the scope of, and in furtherance of, the conspiracy.

## IV.

All that said, Salvador recognizes that he must do more to succeed in his challenge to his sentence than demonstrate that Patrick provides no basis for subjecting him to § 3B1.4's upward adjustment. He must also show that the District Court erred in separately determining that he satisfied § 3B1.4 because he "personally used a minor" by directing a minor to "[m]ove over" during the Rivas murder and by both recruiting and training minors as members of the Sykos MS-13 clique. We therefore must address Salvador's contentions on that score, which we will do after first explaining what we understand the word "use" in § 3B1.4 to mean.[20]

## A.

In Bailey v. United States, 516 U.S. 137 (1995), the Supreme Court of the United States construed a federal statute

---

[20] We consider these arguments even though Salvador did not raise them before the panel. See Chestnut v. City of Lowell, 305 F.3d 18, 21 (1st Cir. 2002) (en banc). The government has elected to "waive reliance on the plain error standard to ease review of the merits."

that criminalizes the "use[] [of] a firearm to commit [a felony offense]." 516 U.S. at 147 (citation omitted). The Court explained that the term "'[u]se' draws meaning from its context" and that it would therefore "look not only to the word itself, but also to the statute and sentencing scheme, to determine the meaning Congress intended." Id. at 143.

The Court first gave "use" its "'ordinary or natural' meaning, a meaning variously defined as '[t]o convert to one's service,' 'to employ,' 'to avail oneself of,' and 'to carry out a purpose or action by means of.'" Id. at 145 (quoting Smith v. United States, 508 U.S. 223, 228-29 (1993)) (alteration in original); see also Smith, 508 U.S. at 229 ("[O]ver 100 years ago, we gave the word 'use' the same gloss, indicating that it means '"to employ"' or '"to derive service from."'" (quoting Astor v. Merritt, 111 U.S. 202, 213 (1884))). The Court then also analyzed the way "use" appeared in the context of the statutory language, explaining:

> The phrase "uses a firearm to commit" indicates that Congress originally intended to reach the situation where the firearm was actively employed during commission of the crime. This original language would not have stretched so far as to cover a firearm that played no detectable role in the crime's commission. For example, a defendant who stored a gun in a nearby closet for retrieval in case the deal went sour would not have "use[d] a firearm to commit" a crime.

Bailey, 516 U.S. at 147 (alteration in original).

- 45 -

Section 3B1.4 contains materially identical language to the language considered in Bailey: "If the defendant used or attempted to use [a minor] to commit the offense . . . increase [the defendant's offense level] by 2 levels." U.S.S.G. § 3B1.4 (emphasis added). As a result, we conclude that § 3B1.4's requirement of "use[]" of a minor "to commit the offense," id., requires some "active[] employ[ment]" of the minor "during commission of the [offense]," as well as that the minor, so employed, play some "detectable role in the [offense]'s commission." See Bailey, 516 U.S. at 147; see also United States v. Butler, 207 F.3d 839, 847 (6th Cir. 2000) (citing Bailey to conclude that "use" requires "affirmative action on the part of a defendant"). Nearly all our sister circuits similarly have concluded that the word "used" in § 3B1.4 requires some "affirmative act" to actually involve the minor in the offense. See United States v. Taber, 497 F.3d 1177, 1180-81 (11th Cir. 2007); United States v. Ramsey, 237 F.3d 853, 860 (7th Cir. 2001); United States v. Suitor, 253 F.3d 1206, 1210 (10th Cir. 2001); United States v. Paine, 407 F.3d 958, 965 (8th Cir. 2005); Butler, 207 F.3d at 849; United States v. Parker, 241 F.3d 1114, 1120 (9th Cir. 2001); United States v. Molina, 469 F.3d 408, 415 (5th Cir. 2006).

It therefore is not enough for the government to show that a minor was merely present during an offense. Nor is it

enough for the government to show that the defendant engaged the minor to some end that was unrelated to, or merely incidental to, the commission of the offense. This interpretation finds ample support in the congressional statute enabling § 3B1.4, which states:

> The [Sentencing] Commission shall provide that the guideline enhancement promulgated . . . shall apply for any offense in relation to which the defendant has . . . used or attempted to use any person less than 18 years of age with the intent that the minor would commit a Federal offense.

Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 140008, 108 Stat. 1796, 2033 (emphasis added); see also U.S.S.G. amend. 527 (1995) (adding the use-of-a-minor Guideline).

**B.**

Against this backdrop, we agree with Salvador that the District Court's determination that Salvador used CW-24, a minor, to commit the offense by "directing" CW-24 to "[m]ove over" during the Rivas murder runs afoul of our ruling today. The commentary to § 3B1.4 explains that "[u]sed or attempted to use," in the use-of-a-minor guideline, "includes directing, commanding, encouraging, intimidating, counseling, training, procuring, recruiting, or soliciting" a minor. U.S.S.G. § 3B1.4 cmt. 1 (emphasis added). The various ways in which a defendant might "use" a minor that are listed in § 3B1.4's application note are

- 47 -

examples, however, of what might constitute a "use or attempted use" under that guideline. They do not modify or supersede that guideline's requirement that the defendant have used the minor "to commit the offense," id. § 3B1.4 (emphasis added), which, as we have explained, requires that the minor play some "detectable role in the [offense]'s commission," Bailey, 516 U.S. at 147; see also, e.g., Ramsey, 237 F.3d at 861 (emphasizing that the defendant "took numerous affirmative actions to involve his brother, a minor, in the distribution of crack cocaine"); Butler, 207 F.3d at 849 (concluding that the district court erred in applying § 3B1.4 absent a finding that the defendant "acted affirmatively to involve [the minor] in the armed bank robbery"); United States v. Garcia, 497 F.3d 964, 970 (9th Cir. 2007) ("The evidence must show that 'the defendant acted affirmatively to involve the minor' in the crime." (citations omitted)).

As we have seen, the storing of a firearm in a nearby closet during a drug deal does not qualify as a "use" of a firearm under Bailey, because that conduct plays no "detectable role" in the commission of the offense. By contrast, the brandishing of a firearm during the commission of a drug deal does so qualify because that conduct plays a "detectable role" in the offense. Bailey, 516 U.S. at 146-47. From all the record shows, CW-24, in merely being told to "move over," was being asked to play a role no more "detectable" in the commission of the murder than that of

- 48 -

the stored firearm in the offense considered in Bailey.  We thus see no basis for concluding that Salvador "used" him to commit the offense.

## C.

There remains to address the District Court's separate ruling that Salvador "used" a minor to commit the offense because he "personally recruited and trained" minors who were members of MS-13.  Salvador does not contend that this determination, if supported by the record, is insufficient to show that he "used" a minor "to commit the offense" in the manner required by § 3B1.4.  Salvador contends only that the District Court erred in making this determination because this case presents "no credible 'evidence concerning [his] recruiting and training of minors.'"  Reviewing for clear error, see Misla-Aldarondo, 478 F.3d at 70, we cannot agree.

The District Court relied for the determination that Salvador had personally recruited and trained minors in part on grand-jury testimony from CW-19, a minor, who was a member of the Sykos clique.  In that testimony, CW-19 described speaking with members of the Sykos clique, including Salvador, about the need for MS-13 members to attack rivals and the methods for doing so.  Based on this testimony, the District Court concluded that CW-19 had "talked to other members of the Sykos clique about MS-13's

mode of operating, particularly killing rivals," and that "those other members included . . . Salvador Gutierrez."

Salvador asserts that the District Court erred in relying on this testimony because it was unexamined grand-jury testimony.  However, "we repeatedly have upheld [the court's] reliance [at sentencing] on prior hearsay testimony never subjected to cross-examination, so long as there were other adequate indicia of reliability."  United States v. Williams, 10 F.3d 910, 914 (1st Cir. 1993) (citing U.S.S.G. § 6A1.3(a)).  Moreover, in so holding, we have taken account of the fact that the prior "testimony was given under oath, subject to the penalties of perjury, [and] in a formal grand jury proceeding" -- as was the case here.  Id. at 914; accord United States v. Zuleta-Alvarez, 922 F.2d 33, 37 (1st Cir. 1990).

Salvador does contend that CW-19's testimony "was not corroborated by any other source."  See United States v. Rojo-Alvarez, 944 F.2d 959, 971 (1st Cir. 1991) ("The reliability of [] evidence may be established by corroboration.").  However, the District Court expressly found CW-19's testimony credible and, in so finding, concluded that CW-19's testimony was "similar" to that of CW-22, another grand-jury witness.  Like CW-19, the District Court stated, CW-22 testified about meetings led by members of the Sykos clique as part of the recruitment and training process, during which "the goals of MS-13 and its mission were discussed,"

and at which he was told that "killing rivals . . . was a goal and part of the Sykos clique's mission."

Salvador fails to explain why the District Court's finding regarding the similarity of the testimony from CW-22 does not constitute a sufficient finding of corroboration of CW-19's testimony regarding similar conversations he had with members of the Sykos clique. We therefore see no merit to this aspect of Salvador's challenge. See United States v. Cintrón-Echautegui, 604 F.3d 1, 6 (1st Cir. 2010) ("[A] sentencing court has wide discretion to decide whether particular evidence is sufficiently reliable to be used at sentencing.").

Salvador further contends that, because CW-19 was a member of the Sykos clique before Salvador joined, CW-19's testimony about Salvador having taken part in CW-19's training is not credible. However, this fact about the timing of CW-19's joining the Sykos clique does not suffice to demonstrate that the District Court clearly erred in relying on CW-19's specific testimony regarding conversations that he had with Salvador and other MS-13 members about the gang's mode of operation. Thus, this aspect of Salvador's challenge fails as well.

Finally, Salvador complains that he did not receive prior notice that the District Court would rely on CW-19's grand-jury testimony in the way that the District Court did. But Salvador did not object to the District Court's reliance on the

testimony, even though Salvador had ample opportunity to do so before sentencing concluded the following week. His claim of unfair surprise is thus undercut by his failure "to meet the claimed exigency" when it arose. United States v. Diaz-Villafane, 874 F.2d 43, 47 (1st Cir. 1989); see also United States v. Mathur, 624 F.3d 498, 508 (1st Cir. 2010) (observing that "allow[ing] the case to proceed to sentencing without objection" "severely undermined" the defendant's claim of unfair surprise (citation omitted)). For this reason, too, then, we reject Salvador's challenge to the application of § 3B1.4's adjustment to him based on a finding that he "personally" used a minor to commit the offense.

**V.**

The sentence is **affirmed**.